924 P.2d 208

STATE of Idaho, Plaintiff–Respondent,

v.

Michael SALSBURY, Defendant,

and

KMVT Broadcasting, a Division of Root Communications, Inc., Defendant–Appellant.

No. 21645.

Supreme Court of Idaho.
Twin Falls, November 1995 Term.

Aug. 28, 1996.

Rehearing Denied Oct. 4, 1996.

Benoit, Alexander, Sinclair, Harwood & High, Twin Falls, for appellant. Thomas B. High argued.

Alan G. Lance, Attorney General; Myrna A.I. Stahman and Michael S. Gilmore, Deputy Attorneys General, Boise, for respondent. Michael S. Gilmore argued.

SCHROEDER, Justice.

KMVT Broadcasting moved to quash a subpoena *duces tecum* issued to obtain videotape taken by a KMVT reporter at the scene of a fatal automobile accident. The prosecution sought the videotape for use in criminal prosecution of a newspaper reporter who was charged with resisting and obstructing a police officer. KMVT asserted a privilege under the First Amendment to the United States Constitution and article I, section 9 of the Idaho Constitution. The district court affirmed the magistrate denying the motion to quash. KMVT appeals the decision.

I.

BACKGROUND AND PRIOR PROCEEDINGS

On September 28, 1993, personnel from several news organizations in Twin Falls went to the scene of a fatal automobile accident in Jerome County, Idaho. A reporter from KMVT Broadcasting (KMVT) reported upon and videotaped the scene of the accident. Portions of the videotape were broadcast by KMVT.

Michael J. Salsbury, a newspaper reporter for *The Twin Falls Times–News* who was covering the accident, was arrested at the scene and charged with resisting and obstructing a police officer. The Jerome County Prosecutor's Office obtained a subpoena *duces tecum* for production of the entirety of

the videotape, including the outtakes not broadcast by the station. The videotape had been placed in the trash prior to the service of the subpoena and was retrieved upon the service of the subpoena.

The accident and videotaping took place near a highway that was viewable to the public. The magistrate conducted an *in camera* inspection of the videotape and determined that Salsbury "is depicted in the videotape on three separate occasions." The magistrate found that the "compelled production of the videotape will not disclose the identity of any confidential sources or confidential information received in a news gathering process." The magistrate also found that requiring production of the nonconfidential and/or unbroadcast videotape in question will have little, if any, chilling effect on the ability of newspersons to gather news or on their editorial process and found that the "matters contained in the videotape are unique and unavailable from other sources."

The decision of the magistrate was affirmed by the district court, which added the following finding of fact:

> The court further finds that the intrusion into the news gathering process is so slight that there will be no chilling effect. As the magistrate court noted, sources will not dry up, nor will there be any significant interference with the ability to gather and report the news. The case at bar requires only that KMVT engage in the ministerial duty of locating and providing a tape that contained no confidential materials nor require (sic) confidential sources to be disclosed.

## II.

### STANDARD OF REVIEW

■ This Court reviews the decision of a magistrate judge independently of a district judge sitting in an appellate capacity, but with "due regard" to the ruling of the district judge. *State Dep't of Health & Welfare v. Annen,* 126 Idaho 691, 692, 889 P.2d 720, 721 (1995); *Ireland v. Ireland,* 123 Idaho 955, 957–58, 855 P.2d 40, 42–43 (1993). "We will uphold the magistrate's findings of fact if supported by substantial and competent evi-

dence." *Id.* at 958, 855 P.2d at 43. "On issues of law, we exercise free review." *Annen, Id.,* (quoting *Ausman v. State,* 124 Idaho 839, 864 P.2d 1126, 1128 (1993)).

## III.

### THE VIDEOTAPE IS NOT COVERED BY A PRIVILEGE UNDER EITHER THE U.S. OR IDAHO CONSTITUTIONS.

The law concerning the existence or the extent of a newsperson's privilege has generally focused on situations in which a newsperson has been called upon to reveal confidential sources of information or information known only to the newsperson from news gathering. The present case does not involve that circumstance. The events that occurred and were videotaped took place in a public place and were observable by anyone present. Regardless of the factual differences, the principal United States Supreme Court decision and the cases of this Court must be examined for guidance.

In a plurality opinion in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the United States Supreme Court addressed the issue of whether requiring newspersons to appear and testify before state or federal grand juries abridged the freedom of speech and press guaranteed by the First Amendment. The testimony at issue involved the revelation of confidential sources of newsgathering information—informants who were under criminal investigations. *Branzburg,* 408 U.S. 665, 92 S.Ct. 2646.

The plurality opinion stated that "[i]t has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Id.* at 684, 92 S.Ct. at 2658. The Court declined to create a testimonial privilege for newspersons that other citizens do not enjoy:

> On the records now before us, we perceive n o basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but

uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.

*Id.* at 690–91, 92 S.Ct. at 2661.

Justice Powell, who cast the deciding vote creating the majority for the decision, wrote a concurring opinion which recognized that courts may determine whether a privilege exists by applying a balancing test:

The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Id.* at 710, 92 S.Ct. at 2671 (Powell, J., concurring).

Justice Stewart's dissent declared that the plurality opinion "invites state and federal authorities to undermine the historic independence of the press by attempting to annex the journalistic profession as an investigative arm of government." *Id.* at 725, 92 S.Ct. at 2671 (Stewart, J., dissenting). Justice Stewart expressed concern over the ability of the press to gather and disseminate news:

A corollary of the right to publish must be the right to gather news. The full flow of information to the public protected by the free-press guarantee would be severely curtailed if no protection whatever were afforded to the process by which news is assembled and disseminated.

*Id.* at 727, 92 S.Ct. at 2672–73.

In response to the plurality's approach to the newsperson's obligation to appear and testify before a grand jury, Justice Stewart proposed the following test:

[W]hen a reporter is asked to appear before a grand jury and *reveal confidences,* I would hold that the government must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law; (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information.

*Id.* at 743, 92 S.Ct. at 2681 (emphasis added) (footnotes omitted).

The three-prong test proposed by Justice Stewart specified that it would be applicable in those cases before a grand jury which seek confidential information acquired by a reporter. The present case does not deal with confidential information.

This case parallels the circumstances dealt with by the United States Supreme Court in *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). The *Stanford Daily (Daily),* a student newspaper at Stanford University, published articles and photographs about a clash between police and student demonstrators. *Id.* The day after publication the Santa Clara County District Attorney's Office obtained a warrant to search the *Daily's* offices for photographic evidence of the clash. The search produced only previously published photographs. *Id.* at 550–51, 98 S.Ct. at 1973–74.

In *Zurcher,* the Court framed the issue as "whether any significant societal interest would be impaired if the police were generally required to obtain evidence from the press by means of a subpoena rather than a search." *Id.* at 574, 98 S.Ct. at 1986. The issue of privilege, which was central to the *Branzburg* decision and to this case, was not asserted. In his dissent, Justice Stewart observed that the parties did not claim that any of the evidence sought was privileged from disclosure. *Id.* (Stewart, J., dissenting). The Court did not specifically address the existence of a privilege. It is clear, however, that the Court was cognizant of First Amendment implications in the decision:

Neither the Fourth Amendment nor the cases requiring consideration of First Amendment values in issuing search warrants, however, call for imposing the regime ordered by the District Court. Aware of the long struggle between Crown

and press and desiring to curb unjustified official intrusions, the Framers took the enormously important step of subjecting searches to the test of reasonableness and to the general rule requiring search warrants issued by neutral magistrates. They nevertheless did not forbid warrants where the press was involved, did not require special showings that subpoenas would be impractical, and did not insist that the owner of the place to be searched, if connected with the press, must be shown to be implicated in the offense being investigated. Further, the prior cases do no more than insist that the courts apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search. As we see it, no more than this is required where the warrant requested is for the seizure of criminal evidence reasonably believed to be on the premises occupied by a newspaper. Properly administered, the preconditions for a warrant—probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness—should afford sufficient protection against the harms that are assertedly threatened by warrants for searching newspaper offices.

*Id.* at 565, 98 S.Ct. at 1981–82

In his concurrence, Justice Powell noted that a magistrate considering an application for a search warrant for press premises "can and should take cognizance of the independent values protected by the First Amendment—such as those highlighted by MR. JUSTICE STEWART—when he weighs such factors." *Id.* at 570, 98 S.Ct. at 1984 (Powell, J., concurring).

The Court's comments make it clear that subpoenas are less intrusive than searches by warrants. In the face of this fact, the U.S. Supreme Court found no First Amendment value that would preclude gathering photographs from the press by search warrant.

In response to the *Zurcher* opinion and spurred by media concern, Congress passed the Privacy Protection Act of 1980, which protects "a person reasonably believed to have a purpose to disseminate to the public newspaper, book, broadcast, or other similar form of public communication ..." from search and seizure at both the state and federal levels except under certain circumstances. 42 U.S.C.A. § 2000aa(a) (West 1994). Basically, the act implements a "subpoena first" rule which requires, with a few exceptions, that a law enforcement officer use a subpoena first, rather than a search warrant to obtain evidence from any person planning to publicly communicate information. *Id.* Based on the act, the subpoena *duces tecum* was a proper means to obtain information from a news organization, since the facts of this case do not fit within the statutory exceptions to the "subpoena first" rule.

Little concerning a newsperson's privilege can be gleaned from the *Zurcher* case, except that under the particular facts, which are almost on all fours with this case, the idea that there might be an applicable privilege that would preclude the state from gathering the type of evidence at issue in this case did not rise high in the thinking of the Stanford Press or the U.S. Supreme Court.

This Court's decisions concerning the existence of a newsperson's privilege have developed around fact situations similar to *Branzburg* involving confidential sources or information, rather than facts similar to *Zurcher,* where the press has simply observed and documented a news event. In *Caldero v. Tribune Pub. Co.*, 98 Idaho 288, 562 P.2d 791, *cert. denied,* 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977), the Court addressed disclosure of an informant in a libel action. *Marks v. Vehlow,* 105 Idaho 560, 671 P.2d 473 (1983), concerned contempt proceedings in a habeas corpus action against a newsperson who declined to reveal information concerning the whereabouts of a child obtained in an interview with the mother. In *In re Contempt of Wright,* 108 Idaho 418, 700 P.2d 40 (1985), the Court was called upon to determine the existence and extent of any privilege in the context of the state's effort to obtain the names of confidential sources concerning criminal activity.

In *Caldero v. Tribune Pub. Co.,* this Court interpreted *Branzburg* and affirmed the determination of the district court that a newsman was in contempt for refusal to identify

an informant in a libel action brought against the newspaper. 98 Idaho at 298, 562 P.2d at 801. This Court held that, "our reading of *Branzburg v. Hayes, supra,* is to the effect that no newsman's privilege against disclosure of confidential sources founded on the First Amendment exists in an absolute or qualified version." *Id.* at 294, 562 P.2d at 797. The Court further stated the following:

> The underlying rationale of the First Amendment protection of freedom of the press is clear. In a society so organized as ours, the public must know the truth in order to make value judgments, not the least of which regard its government and officialdom. The only reliable source of that truth is a "press" (which is to say everyone—pamphleteers, nonconformists, undergrounders) which is free to publish that truth without government censorship. We cannot accept the premise that the public's right to know the truth is somehow enhanced by prohibiting the disclosure of truth in the courts of the public.

*Id.* at 298, 562 P.2d at 801.

In *Marks v. Vehlow,* a reporter had obtained information in an interview with the mother of a child whose whereabouts were in question. 105 Idaho at 563, 671 P.2d at 476. The mother had disobeyed a court order to return the child to the father's custody. *Id.* Following publication of an article based on the interview the reporter was questioned in a habeas corpus proceeding concerning information about the location of the child. 105 Idaho at 563–64, 671 P.2d at 476–77. The reporter refused to answer certain questions, and the trial court found the reporter in contempt. *Id.* at 564, 671 P.2d at 477.

This Court determined that under the specific facts in *Marks* there was no qualified newsperson's privilege and affirmed the finding of contempt:

> We believe that here the compelling state interests—the sanctity of the writ of habeas corpus and the safety of the child—outweigh any public interest in an unfettered press.
>
> We view this case as presenting a unique set of circumstances—a habeas corpus proceeding in which a journalist is a witness. Because we find a compelling and legiti-

mate governmental interest in assuring the efficacy of the writ of habeas corpus, we hold that here there is no qualified newsman's privilege beyond the usual inquiry concerning relevance and materiality of the information sought. Furthermore, we believe that the obligation to attend and to give testimony in a habeas corpus proceeding wherein liberty interests are determined is at least as compelling as the duty to appear before a grand jury, *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *cf. Matter of Farber,* 78 N.J. 259, 394 A.2d 330, 334 (obligation to appear on behalf of a criminal defendant as compelling as duty to appear before a grand jury), *cert denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978). The concealing of information or the identities of informants which could lead to the discovery of a person sought by means of habeas corpus proceedings should be discouraged. We therefore decline to establish a specific newsman's privilege with respect to such information.

> Here, a child was sought by means of a writ of habeas corpus. While possible infringement of a journalist's news gathering right may occur by requiring disclosure, the disclosure is essential to assure the continued vitality of habeas corpus proceedings which in turn provide protection against unjustified intrusions upon our individual liberty.

*Id.* at 568–69, 671 P.2d at 481–82 (footnote omitted).

*Marks* neither expressly embraced nor disavowed a qualified newsperson's privilege under other circumstances. However, the *Marks* court emphasized two elements in making its determination: 1) the sanctity of the writ of habeas corpus, and 2) the safety of the child. Those factors were seen as outweighing any public interest in an unfettered press. 105 Idaho at 568, 671 P.2d at 481.

In *In re Contempt of Wright,* the state sought the names of confidential sources who had been interviewed in the course of writing an article about marijuana growing. 108 Idaho at 419, 700 P.2d at 41. This Court

disavowed any interpretation of *Caldero* to the effect that there was no privilege applicable to the press and held that there is a qualified newsperson's privilege, reaching that conclusion by various routes. Justice Huntley concluded that a qualified privilege derived from both the First Amendment to the United States Constitution and article I, section 9 of the Idaho Constitution. *Id.* at 422–43, 700 P.2d at 44–45. Justice Donaldson concluded that the decision should not be grounded on the U.S. Constitution in view of the lack of clarity following the U.S. Supreme Court decision in *Branzburg,* but found a privilege in the Idaho Constitution. *Id.* at 423–24, 700 P.2d at 45–46, (Donaldson, C.J., concurring specially). Justice Bistline opined that he agreed with Justice Huntley that there is a qualified privilege under both the United States and Idaho Constitutions, but the Court should not decide on those grounds, Justice Bistline found a co-extensive common law privilege. *Id.* at 424–28, 700 P.2d at 46–50, (Bistline, J., concurring specially). Justice Bakes concurred in the result, but relied only upon the United States Constitution, finding no such privilege under the Idaho Constitution or the common law. *Id.* at 428, 700 P.2d at 50 (Bakes, J., concurring specially).

When the various opinions in *Wright* are tallied there are several conclusions that follow. A majority of the Court determined that there is a qualified newsperson's privilege under the First Amendment to the United States Constitution (Justices Huntley, Bistline, and Bakes). A different majority determined that the same privilege exists under the Idaho Constitution (Justices Huntley, Bistline, and Chief Justice Donaldson).

■ There is a balancing test between the freedom of the press—the right of the public to have an unfettered press—and the right of the public to disclosure in the particular proceeding. This is a case-by-case analysis. The press has no absolute immunity, and the public has no absolute right to disclosure. The balance must be analyzed in the particular case to determine whether a privilege applies to shield the press or does not apply so as to allow public access to the information. Justice Powell, whose concurring opinion in *Branzburg* created a majority for the result, wrote the following:

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Branzburg,* 408 U.S. at 710, 92 S.Ct. at 2671 (Powell, J., concurring).

In this case, the magistrate judge found that requiring production of the unbroadcast videotape in question will have little, if any, chilling effect on the ability of newspersons to gather news or on their editorial process. Additionally, the magistrate concluded that the videotape contains relevant evidence that is of significant interest in the criminal case, and that the matters contained in the videotape are unique and unavailable from other sources. The district court affirmed the magistrate court. The district court concluded that the three-prong test from Justice Stewart's dissent in *Branzburg,* which was referred to in *Wright,* was not applicable since this case involves no confidential information. However, the district court conducted an analysis of relevancy, alternative means, and compelling interest, concluding that disclosure would be required even if the three-prong test were applicable.

This case is clearly different from *Caldero* and *Wright.* There is no confidential informant. The evidence sought is videotape shot at a public event—a fatal car accident on a public highway. This was a public event which was readily viewable to anyone present. The videotape itself had been discarded. There is no realistic threat of restraint or impingement on the free flow of information to the press and public by requiring production of the videotape. Credibility balks at the idea that a TV station might stop covering fatal automobile accidents if a consequence is that the station may be required to produce the videotape in a criminal prosecution. The material sought in this case is not a confidential source nor any form of

confidential information. As determined by the magistrate, compelled disclosure will have little, if any, "chilling effect" on the news gathering process. Under the facts of this case, the qualified privilege which has been recognized by this Court in some instances is not applicable.

## IV.

## CONCLUSION

The decisions of the district court and the magistrate court are affirmed. Costs are awarded on appeal. I.A.R. 40.

McDEVITT, C.J., TROUT and SILAK, JJ., concur.

JOHNSON, Justice, dissenting.

I respectfully dissent from the Court's conclusion that the qualified privilege does not apply in this case. In my view, the state did not demonstrate the need for the videotape.

In the hearing on the motion to quash the subpoena duces tecum, the prosecutor stated that there were a number of people at the accident scene at the time of the alleged resisting and obstructing a police officer by the newspaper reporter. The prosecutor listed six police officers as witnesses. The prosecutor argued that the state needed the videotape because the police officers may not have been observing the newspaper reporter at all times. When the magistrate judge asked the prosecutor whether he had contacted or interviewed all the onlookers and bystanders to ascertain whether they were watching the newspaper reporter all the time, the prosecutor said he had not. These onlookers and bystanders may well have satisfied the very need for which the prosecutor said he needed the video tape.

In my view, the state has not satisfied the second and third elements of the test adopted by this Court in *In re Contempt of Wright*, 108 Idaho 418, 421–23, 700 P.2d 40, 43–45 (1985). These elements are:

(2) Whether the information sought cannot be obtained by alternative means less destructive of First Amendment rights;

(3) Whether there is demonstrated a compelling and overriding interest in the information.

*Id.* at 421, 700 P.2d at 43.