2005 VT 103

## In re Inquest Subpoena (WCAX)

[890 A.2d 1240]

No. 05-004

Present: **Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Gibson, J. (Ret.),
Specially Assigned**

Opinion Filed August 26, 2005

*Robert V. Simpson, Jr.*, Chittenden County State's Attorney, Burlington, for Appellant.

*Eric S. Miller* and *Debra L. Bouffard* of *Sheehey Furlong & Behm P.C.*, Burlington, for Appellee Mt. Mansfield Television, Inc.

*Arthur P. Anderson* of *Anderson & Buran PC*, Burlington, for Amicus Curiae WPTZ-TV.

*Robert B. Hemley* of *Gravel and Shea*, Burlington, for Amici Curiae Gannett Vermont Publishing, Times Argus Association and Herald Association.

*Lucy A. Dalglish*, *Gregg P. Leslie* and *Grant D. Penrod*, Arlington, Virginia, for Amicus Curiae The Reporters Committee for Freedom of the Press.

*Kevin M. Goldberg* of *Cohn and Marks LLP*, Washington, DC, for Amicus Curiae American Society of Newspaper Editors.

*Kathleen A. Kirby* of *Wiley Rein & Fielding LLP*, Washington, DC, for Amicus Curiae Radio-Television News Directors Association.

*Bruce W. Sanford* and *Robert D. Lystad* of *Baker & Hostetler LLP*, Washington, DC, for Amicus Curiae Society of Professional Journalists.

¶ 1. **Johnson, J.** In the early morning hours of October 21, 2004, what began as a celebration of the historic victory of the Boston Red Sox over the New York Yankees in the American League Championship Series turned into a riot on the campus of the University of Vermont. Signs and light poles were knocked down, a vehicle was overturned, windows were broken, and four fires were set. Damage amounted to $30,000. A local television station, WCAX, sent two camera operators and a reporter to the scene and took about forty-four minutes of videotape of the riot in progress. Of that material, only a few minutes were aired on the station's broadcast news program. The segment that aired showed persons, presumably students, committing some of the crimes and vandalism described above.

¶ 2. The day after the riot, the Chittenden County State's Attorney applied to the district court for an inquest, pursuant to 13 V.S.A. § 5131. The application included a University of Vermont police officer's affidavit, and asked the court to issue a subpoena for the unaired video footage, or "out takes," of the riot. WCAX moved to

quash the subpoena on First Amendment grounds, and the State moved to open the inquest subpoena filings to the public.

¶ 3. Unlike many other states, Vermont has no statute protecting information obtained by news media, and no party has raised a question of the applicability of any provision of the Vermont Constitution to this dispute. WCAX's argument is that the First Amendment to the United States Constitution excuses it from surrendering the tape.

¶ 4. The trial court heard the matter on December 9, 2004. The court indicated at the outset that WCAX was entitled to a qualified privilege that could be overcome only if the State had made sufficient efforts to exhaust other, nonprivileged sources of information. At that time, the trial court was not satisfied with the State's efforts. The State did more investigation and asked the court to issue a second subpoena. The court heard the case on the second request and again held that the State had not met its burden to adequately investigate other avenues of information.

¶ 5. Applying its understanding of our decision in *State v. St. Peter*, 132 Vt. 266, 315 A.2d 254 (1974), the court concluded that there is a qualified privilege for newsgatherers and that such privilege could be overcome only by a showing that the materials sought were relevant and material to the issue of guilt or innocence, and that there was no other reasonably available source for the information. The court found that the first prong of the test was easily satisfied because the videotape showed persons in the act of committing crimes and the identity of the perpetrators could be learned from viewing the videotape. It was the State's investigative efforts that the trial court found lacking under the second prong. The trial court quashed the subpoena and the State appealed.

¶ 6. We reverse the decision of the district court. In the circumstances of this case, no privilege, qualified or otherwise, excuses WCAX from furnishing the videotape of the riot. Therefore, the State did not have to show that the materials were not available from other sources. The facts here are essentially indistinguishable from those in *Branzburg v. Hayes*, 408 U.S. 665 (1972), in which the United States Supreme Court held that there is no constitutional privilege under the First Amendment that excuses reporters from appearing and testifying before grand juries investigating criminal conduct, even if the source of their information is confidential.

¶ 7. In *Branzburg*, the Supreme Court considered consolidated appeals in three cases, each of which involved a reporter who asserted that the First Amendment gave him a privilege to refuse to testify in a

grand jury investigation into criminal activity because such compelled testimony would result in a burden on news gathering that outweighed any public interest in obtaining the information. 408 U.S. at 681. All three reporters had been engaged in investigations of newsworthy issues, two of them extending over a period of time. In one case, a reporter had been investigating drug trafficking and had published a photograph showing hands working on hashish. He also published an article claiming to have observed people smoking marijuana. The reporter refused to identify the individuals he had seen in possession of drugs. In another case, a reporter had refused to answer questions about his interviews with members of the Black Panther Party at a time when the Black Panthers were under federal grand jury investigation in California for numerous federal crimes, including conspiracy to assassinate then President Richard Nixon, interstate travel to incite a riot, and mail fraud. In the third case, a reporter had been on assignment in the area during the time of a civil disorder. He had been allowed access to the private headquarters of the Black Panthers upon his express agreement that he not disclose anything he saw or heard except for activities related to an anticipated raid by the police. The reporter answered questions as to what he had observed outside the headquarters, but refused to disclose what he had seen and heard while inside the building. In each case, it was not disputed that the criminal grand jury investigations were conducted in good faith and not for the purpose of harassing the press. The Court described the sole issue before it as "the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime." *Id.* at 682.

¶ 8. The Court found that the "longstanding principle that 'the public ... has a right to every man's evidence,'" should prevail in grand jury proceedings where the task is to inquire into the existence of possible criminal conduct, unless such evidence is privileged by a constitutional, common-law or statutory privilege. *Id.* at 688. It found no existing privilege in either the common law or federal statutes, and declined to create one for reporters under the First Amendment. *Id.* at 688-90.

> [W]e perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.

*Id.* at 690-91.

¶ 9. This case does not, of course, involve the protection of any confidential source, as the WCAX reporters witnessed and videotaped a public event that was exposed for all to see. But the Court's statements regarding the duty of reporters who have witnessed crimes, and the policy considerations that may be implicated on such occasions, apply with equal force here. With respect to. a reporter's concealment of evidence of a crime, the Court stated:

> [W]e cannot seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it. Insofar as any reporter in these cases undertook not to reveal or testify about the crime he witnessed, his claim of privilege under the First Amendment *presents no substantial question.* The crimes of news sources are no less reprehensible and threatening to the public interest when witnessed by a reporter than when they are not.

*Id.* at 692 (emphasis added).

¶ 10. Even accepting the asserted fact that some news sources might "dry up" as a result of its decision, the Court found that the public interest in future news about crimes was of less weight than the interest in prosecuting crimes already committed. While the press has the right to withhold whatever information from publication that it chooses, the exercise of that right does not grant the press a First Amendment "exemption" from the ordinary duty of all citizens to furnish relevant information to a grand jury.

¶ 11. *Branzburg* is controlling here notwithstanding the fact that the state's attorney proceeded by way of an inquest pursuant to 13 V.S.A. § 5131, rather than by convening a grand jury. Like a grand jury investigation, an inquest is a process whose purpose is to aid in the inquiry into the existence of probable cause to believe that a crime has been committed. See *State v. Alexander*, 130 Vt. 54, 60-61, 286 A.2d 262, 265-66 (1971) (recognizing that inquest and grand jury both involve questions of probable cause); *In re D.L.*, 164 Vt. 223, 226, 669 A.2d 1172, 1175 (1995) (discussing history of inquest procedure in Vermont and distinctions from grand jury). The fact that an inquest does not involve a distinct body having the power to charge persons

with crimes is immaterial. The essential consideration is its role in the investigation of crime.[1]

¶ 12. Our decision in *State v. St. Peter* is entirely consistent with *Branzburg*, and does not compel a different result here. In *St. Peter*, a reporter was held in contempt of court for refusing to answer questions about a drug raid in Rutland County. The reporter's deposition was sought, not by the state's attorney in the pursuit of a criminal prosecution, but by several defendants in criminal cases that resulted from the raid. The defendants were attempting to find out from the reporter the source of his knowledge that the raid was going to take place. The reporter refused to answer questions pertaining to his conversations with law enforcement personnel, raising a claim of privilege under the First Amendment. The district court compelled him to answer under our pretrial discovery rules, and he appealed.

¶ 13. In reversing, we acknowledged *Branzburg*'s holding that reporters were not entitled to refuse to answer questions in grand jury proceedings. 132 Vt. at 269, 315 A.2d at 256. We also recognized that no such privilege existed at common law. *Id.* But, in answering the certified question, we took note of Justice Powell's brief concurrence in *Branzburg*, emphasizing the majority's view that a news reporter was not without recourse to the courts, even in a grand jury context, if the reporter "has some ... reason to believe that his testimony implicates [a] confidential source relationship[] without a legitimate need of law enforcement." *Branzburg*, 408 U.S. at 710 (Powell, J., concurring).[2]

---

[1] In fact, as the State correctly argues, under *Zurcher v. Stanford Daily*, it could have applied for a search warrant supported by the affidavit it filed with the inquest application. See 436 U.S. 547, 563-68 (1978) (holding that strict application of Fourth Amendment requirements to search for unpublished photographs that were relevant and material to criminal investigation adequately safeguarded rights of the press to gather, analyze, and disseminate news). Instead, consistent with federal law after *Zurcher*, which now requires federal prosecutors to proceed by subpoena rather than search warrant, 42 U.S.C. § 2000aa, the state's attorney used the inquest subpoena to allow WCAX to retain the videotape while it litigated its First Amendment claims. Although we have no similar state statute compelling the state's attorney to proceed in the manner it did, that procedure has the merit of allowing any person or entity, including the news media, the opportunity to challenge the request before having to surrender the information.

[2] Our decision in *St. Peter* cannot give greater rights to the media than did the federal constitutional holding in *Branzburg* on which it relies. *Branzburg* is an authoritative 5-4 decision with Justice Powell writing a separate "simple concurrence," expressing additional views in response to the dissent, but agreeing with the judgment and the rationale of the majority. See I. Kirman, Note, *Standing Apart to be a Part: The Precedential Value of Supreme Court Concurring Opinions*, 95 Colum. L. Rev. 2083,

¶ 14. Unlike the present case, *St. Peter* was not concerned with a criminal investigation by the State. Indeed, the evidence sought did not concern the commission of a crime. Moreover, the circumstances under which discovery was sought in *St. Peter* suggested harassment of the reporter by the persons seeking it. We permitted the reporter to assert a privilege, holding that

> when a newsgatherer, *legitimately entitled to First Amendment protection*, objects to inquiries put to him in a deposition proceeding conducted in a criminal case, on the grounds of a First Amendment privilege, he is entitled to refuse to answer unless the interrogator can demonstrate to the judicial officer appealed to that there is no other adequately available source for the information and that it is relevant and material on the issue of guilt or innocence.

132 Vt. at 271, 315 A.2d at 256 (emphasis added). If it is divorced from its context, the holding of *St. Peter* may appear to be quite broad, but the decision must be read with reference to its facts, which concerned an inquiry of an entirely different nature from the one involved here. *St. Peter* is expressly limited to cases in which a news reporter is "legitimately entitled to First Amendment protection." *Branzburg* makes clear, however, that no First Amendment protection covers the circumstances of this case. The balancing test adopted in *St. Peter* does not apply and, therefore, the district court erred when it required the State to justify the extent to which the police had investigated other sources of information.

¶ 15. Many federal and state courts have followed *Branzburg* in similar fact situations, including cases in which reporters have been eyewitnesses to criminal activity or in which reporters have withheld information relevant to a criminal proceeding. Most notable is the

2084 (1995) (describing the precedential effect of a simple concurrence as distinguished from a "concurrence in the judgment," which is essentially a dissent from the majority's rationale, but not its result). The decision is, therefore, controlling. See *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964, 971 (D.C. Cir.) ("White's [*Branzburg*] opinion is not a plurality opinion of four justices joined by a separate Justice Powell to create a majority, it is the opinion of the majority of the Court. As such it is authoritative precedent."), *cert. denied by Miller v. United States*, 545 U.S. 1150, 125 S. Ct. 2977 (2005). The concurrence, which we discussed in *St. Peter*, emphasized the limited nature of the majority's holding by reinforcing the majority's view that the courts remain open to news reporters who claim that a subpoena for information is unrelated to any legitimate law enforcement purpose. *Branzburg*, 408 U.S. at 709 (Powell, J., concurring).

recent decision *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964, 970 (D.C. Cir. 2005), in which the D.C. Circuit held that an investigative reporter for the New York Times, the White House correspondent for the news magazine Time, and Time, Inc., its publisher, were not entitled to a First Amendment privilege to refuse to divulge confidential sources to a grand jury that was investigating whether government officials had committed a crime in disclosing the identity of a CIA operative. The court of appeals rejected the respondents' claims that a qualified privilege, recognized in some *civil* cases in the circuit, gave the reporters the right to First Amendment protection of their confidential sources in a criminal case, finding no meaningful distinction between the case before the court and *Branzburg*. 397 F.2d at 972; see also *United States v. Smith*, 135 F.3d 963, 969-71 (5th Cir. 1998) (holding that there is no qualified privilege to withhold nonconfidential information related to criminal case); *In re Shain*, 978 F.2d 850, 852 (4th Cir. 1992) (holding that reporters have no privilege to refuse to testify when information sought is relevant to criminal investigation); *United States v. LaRouche Campaign*, 841 F.2d 1176, 1181 (1st Cir. 1988) (defendants entitled to subpoena nonconfidential out takes of interview with government witness in criminal case regardless of whether privilege applied); *In re Ziegler*, 550 F. Supp. 530, 532-33 (W.D.N.Y. 1982) (requiring that reporter who witnessed crime must testify); *CBS, Inc. v. Jackson*, 578 So. 2d 698, 700 (Fla. 1991) (recognizing that there is no difference for First Amendment purposes between reporter's eyewitness observations and videotape recording of same events in criminal proceeding); *Miami Herald Publ'g Co. v. Morejon*, 561 So. 2d 577, 580 (Fla. 1990) (stating that there is no privilege to refuse to testify as to eyewitness observation of relevant event in criminal case); *State v. Salsbury*, 924 P.2d 208, 213-14 (Idaho 1996) (affirming magistrate's order that television station comply with subpoena duces tecum for out take footage depicting a criminal suspect at the time and place of the crime).

¶ 16. In the face of the clear holding in *Branzburg*, and its application to similar fact situations in numerous other cases, WCAX argues that our decision in *St. Peter* should be extended to protect nonconfidential as well as confidential sources. It contends that to permit the State access to the videotape implicates First Amendment concerns, even though its source is a public event, because doing so would permit the State to adopt the "investigative function of a free press as an arm of the prosecution." *St. Peter*, 132 Vt. at 270, 315 A.2d at 256. WCAX relies on a number of cases it claims establish a majority rule in favor

of a qualified privilege for news gathering regardless of whether there is a confidential source to protect.

¶ 17. But confidentiality is not the controlling issue in this case. WCAX is presumably in possession of evidence of multiple crimes. Under *Branzburg*, whether that kind of evidence arises from a confidential or nonconfidential source is irrelevant. When evidence is sought pursuant to a criminal investigation undertaken in good faith, and when the connection to a law enforcement purpose is real and not tenuous, the evidence must be disclosed. And when it is beyond dispute, as it is here, that the evidence sought to be produced is evidence of the crime itself, the claim under the First Amendment "presents no substantial question." *Branzburg*, 408 U.S. at 692.

¶ 18. WCAX relies on cases that are simply inapposite. Some of the cases discuss a qualified privilege for the news media in the context of civil cases in which the public policy issues, including the burden placed on the media to respond to civil discovery as third parties, are different; in those cases, the confidentiality or nonconfidentiality of sources was a primary issue. None of these decisions, however, involved a criminal case for which a state or federal prosecutor sought relevant and material evidence. See *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 35 (2d Cir. 1999) (qualified privilege for news media based on federal common law, not the First Amendment, in civil rights action was easily overcome because information sought was not confidential); *Shoen v. Shoen*, 5 F.3d 1289, 1292, 1297 (9th Cir. 1993) (holding, in civil case, privilege applied to nonconfidential material, and quashing plaintiffs' subpoena to author of book about plaintiffs' family business for failure to first take deposition of defendant, who was the ultimate source of information plaintiffs sought); *Bell v. City of Des Moines*, 412 N.W.2d 585, 588-89 (Iowa 1987) (acknowledging presumptive privilege in favor of news media in civil suit in which published television tapes were sought by private party in suit arising from suicide); *Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 61 (D.D.C. 2003) (affording privilege to military newspaper reporter in civil action for money damages); *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 121-23 (D.D.C. 2002) (applying privilege to quash subpoena for sources and information relevant to civil action filed by son of Iranian dissident against Iran for its alleged assassination of father).

¶ 19. In the two criminal cases cited by WCAX, news organizations were ordered to disclose nonconfidential information despite their First Amendment claims. They provide no support for WCAX's position here. In *United States v. LaRouche Campaign*, 841 F.2d at

1181, the First Circuit found no First Amendment violation when the defendants subpoenaed nonconfidential "out takes" of television networks as relevant to a criminal case against them. Although the court was concerned that the judiciary tread lightly when subpoenas were issued against the press, it stated:

> When there is no confidential source or information at stake, the identification of First Amendment interests is a more elusive task. ... We have been referred to no authoritative sources demonstrating or explaining how any chilling effect could result from the disclosure of statements made for publication without any expectation of confidentiality.

*Id.* In perhaps the most privilege-friendly case cited by WCAX, *United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir. 1980), the court recognized a qualified privilege for nonconfidential material held by a news organization, and held that a balancing of First Amendment interests against the interests of individuals against whom criminal charges had been brought was required in every case. Nevertheless, the court ordered CBS, the media party from whom information was sought, to disclose to the defendants statements CBS had obtained from government witnesses who would be called to testify. It is questionable whether *Cuthbertson* can be squared with *Branzburg,* and to the extent the decision is inconsistent with *Branzburg* in recognizing a privilege and requiring balancing in every case, we are bound to reject it. We note, however, that even in *Cuthbertson,* the court ruled that what it saw as the First Amendment interest was overcome in light of the relevance of the witnesses' statements to issues in the criminal proceeding. *Id.* at 148-49.

¶ 20. WCAX's argument that release of the videotape will allow the state's attorney to adopt the "investigative function of a free press as an arm of the prosecution" is unavailing. Whether that is the case here, a reporter's investigation of criminal activity is exactly the kind of information *Branzburg* does not allow reporters to shield, absent proof that the investigation is motivated by an illegitimate purpose. 408 U.S. at 709 (Powell, J., concurring).

¶ 21. In short, WCAX is entitled to no privilege under the First Amendment, qualified or otherwise, to refuse to disclose evidence of a crime, or evidence that is relevant and material to a criminal investigation, when properly subpoenaed. Because the trial court found that the evidence sought by the state's attorney pursuant to the inquest subpoena was relevant and material to a criminal investigation, the

state's attorney is not required to make any showing that the material is not obtainable through other sources.

*Reversed. WCAX shall respond to the subpoena and produce the videotape forthwith.*