2007 VT 98

# James H. Spooner v. Town of Topsham

[937 A.2d 641]

No. 06-208

Present: Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and Gibson, J. (Ret.), Specially Assigned

Opinion Filed September 7, 2007

*Edwin L. Hobson*, Burlington, for Plaintiff-Appellant.

*Andrea L. Gallitano* of *Otterman and Allen, P.C.*, Barre, for Defendant-Appellee Town of Topsham.

*Robert B. Hemley* and *Megan J. Shafritz* of *Gravel and Shea*, Burlington, for Defendant-Appellee Buermeyer.

¶ 1. **Reiber, C.J.** The question presented is whether, under the qualified privilege for reporters first recognized by this Court in *State v. St. Peter*, 132 Vt. 266, 315 A.2d 254 (1974), a newspaper reporter may properly refuse to testify as to events he witnessed at a public selectboard hearing where such events, though observed by others, are relevant to significant issues in a pending civil lawsuit. We hold that, on the facts presented, the reporter here was not entitled to withhold his testimony. Accordingly, we reverse the trial court judgment, and remand for further proceedings.

¶ 2. The material facts are largely undisputed. At a meeting held on September 10, 2001, the Town's selectboard interviewed several candidates, including plaintiff James Spooner, for the position of road foreman. After a discussion held in executive

session, the board announced in open session that it had selected Bryan Hart for the position. Two members of the board, William Appleton and Bruce Thompson, explained the reasons for their decision. One week later, the Journal Opinion, a weekly newspaper based in Bradford, Vermont, published an article by Hank Buermeyer, who had attended the meeting as a reporter for the paper. The article reported the selectmens' explanation as follows:

> "He's younger, so we can get a lot more service," Thompson said of why Hart had been chosen over the other three candidates. Thompson added that Hart was not related to anybody [on the selectboard], "and that's important for a position of that magnitude."

> Appleton agreed with Thompson, saying, "Bryan had some experience. I'm told he's very capable of learning. He's younger."

¶ 3. Plaintiff subsequently filed an employment-discrimination complaint against the Town with the Attorney General's office, claiming that he had been denied the position because of his age. The Town denied the charge, asserting that it had rejected plaintiff's candidacy solely because he was related to a number of Town officials, including Anthony Spooner, a member of the Town selectboard, and Juanita Claflin, the Town clerk. The Attorney General's investigation concluded that the evidence was sufficient to support the discrimination claim, and plaintiff thereupon filed a civil complaint against the Town under the Fair Employment Practices Act, 21 V.S.A. § 495.[1]

¶ 4. Relying on the newspaper article, plaintiff identified Buermeyer, the Journal Opinion reporter, as a likely trial witness and issued a subpoena to depose the reporter, later explaining that he would confine the inquiry to what the reporter had heard at the meeting.[2] The newspaper moved to quash the subpoena.

---

[1] The record reveals that the initial complaint may have been instigated by the Journal Opinion reporter, who contacted plaintiff after the meeting to advise him that the board's action was illegal. Although plaintiff argued unsuccessfully below that the reporter had somehow waived the First Amendment privilege by his subsequent conduct, plaintiff has not renewed the claim on appeal.

[2] The Town issued a subpoena as well, seeking the disclosure of all "documents and notes" generated in connection with the article. Although the Town later professed to be neutral as to whether the reporter testified, it made clear its intent to press for discovery beyond the events at the selectboard hearing in the event that he

Following extensive briefing, the court held a hearing on the motion in December 2005, and issued its written decision in March 2006. Based upon its review of state and federal law, the court concluded that the reporter was entitled to assert a qualified privilege to withhold his testimony unless plaintiff could show that the information sought was relevant to a significant issue in the case, and was not reasonably obtainable from other sources. Although the court found that the reporter's testimony was relevant, it concluded that plaintiff had not shown that the same or similar information was unavailable from other witnesses who had attended the selectboard hearing. Disclosure in these circumstances would also, in the court's estimation, exert a "chilling" effect on the "willingness of journalists to attend certain public meetings," in contravention of free-press interests. Accordingly, the court granted the motion to quash. Plaintiff moved for permission to bring an interlocutory appeal, which we granted.[3]

¶ 5. Although it remains a subject of continuing controversy, any discussion of the so-called reporter's privilege must begin in 1972, with the landmark United States Supreme Court ruling in *Branzburg v. Hayes*, 408 U.S. 665 (1972). There, the high court held that the First Amendment does not afford a privilege to journalists to refuse to appear before a grand jury to answer questions in a criminal investigation concerning the identity of confidential news sources or information derived from those sources. *Id.* at 667. Courts and commentators have been analyzing the scope and meaning of the four-Justice plurality opinion authored by Justice White in *Branzburg* ever since.

¶ 6. The source of confusion was the unusual four-one-four division on the Court. As noted, the plurality opinion authored by Justice White ruled that there was no constitutional privilege

---

did. As the Town later explained, this included all information relating to any meetings between the reporter and plaintiff or other potential witnesses, records indicating any "bias" by the reporter or the newspaper, the reporter's "file," any evidence of "prior inaccurate stories," and all records relating to the "editorial policy" of the Journal Opinion. Although the Town requested that the court preserve its discovery options, the court's ruling granting the newspaper's motion to quash plaintiff's subpoena effectively barred further discovery by the Town as well.

[3] The newspaper argues that plaintiff's appeal fails to meet the criteria for interlocutory review, but the motion was fully briefed, and we decline to revisit our decision.

under the First Amendment excusing reporters from appearing and testifying before a grand jury. Four Justices dissented from this holding. One, Justice Douglas, advocated for an absolute journalistic privilege to decline to appear before the grand jury. *Id.* at 711-25. Three, in an opinion authored by Justice Stewart, argued for a qualified privilege allowing reporters to refuse to reveal confidences unless the government demonstrates probable cause to believe that the reporter has information clearly relevant to the criminal charge which cannot be obtained by alternative means "less destructive of First Amendment liberties." *Id.* at 739-40. Justice Stewart explained the rationale for a constitutionally based reporter's privilege as follows: "A corollary of the right to publish must be the right to gather news. The full flow of information to the public protected by the free-press guarantee would be severely curtailed if no protection whatever were afforded to the process by which news is assembled and disseminated." *Id.* at 727 (Stewart, J., dissenting).

■ ¶ 7. In a separate concurring opinion, Justice Powell joined the four-Justice plurality in finding no privilege on the facts, but emphasized the "limited nature of the Court's holding." *Id.* at 709. Justice Powell suggested that future claims should be resolved on a case-by-case basis, balancing the constitutional right to "freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Id.* at 710. In striking such a balance, Justice Powell echoed the dissent in requiring that the government demonstrate a "legitimate need" for information that is relevant to the investigation. *Id.*

¶ 8. Despite the absence of a clear holding in *Branzburg*, nearly every federal circuit has since concluded that Justice Powell's concurrence, in conjunction with the four-Justice dissent, established a qualified First Amendment reporter's privilege outside the grand-jury context. All but a few states have adopted some form of qualified reporter's privilege as well, either by statute or case law. See generally A. Fargo, *Analyzing Federal Shield Law Proposals: What Congress Can Learn from the States*, 11 Comm. L. & Pol'y 35, 46 (2006) (noting that thirty-one states have enacted reporter's shield laws, and appellate courts in all but a few others have recognized a qualified privilege); J. Nestler, Comment, *The Underprivileged Profession: The Case for Supreme Court Recognition of the Journalist's Privilege*, 154 U. Pa. L. Rev. 201, 203 (2005) (observing that "[a]lmost every state and federal

circuit now provides at least some type of statutory, common law, or constitutional protection for journalists").

¶ 9. Vermont was in the vanguard of state courts relying on *Branzburg* to recognize a qualified First Amendment reporter's privilege. In *St. Peter*, several criminal defendants had sought to depose a television news reporter "to determine the source of [the reporter's] foreknowledge" about a drug raid conducted by the state police. 132 Vt. at 268, 315 A.2d at 255. The reporter declined to answer questions on the subject, claiming a privilege under the First Amendment. The matter was referred to district court, where the reporter again refused to answer and was consequently held in contempt. The trial court certified the question for interlocutory review, which we accepted on the relatively narrow but important issue presented.

¶ 10. Writing for the Court, Justice Barney acknowledged at the outset the significance of the then-recent Supreme Court decision in *Branzburg* in which the Court declined to recognize a reporter's privilege to withhold information from grand juries. *Id.* at 269, 315 A.2d at 255. Justice Barney went on to observe, however, that the *Branzburg* holding was a relatively narrow one and that the "language and attitude of the . . . majority does not indicate an entire absence of concern for the newsgathering function so relevant to the full exercise of the First Amendment." *Id.* "Even more noteworthy," he found, was "the concurring opinion of Mr. Justice Powell suggest[ing] that the First Amendment supports enough of a privilege in newsgatherers to require a balancing between the ingredients of freedom of the press and the obligation of citizens, when called upon, to give relevant testimony relating to criminal conduct." *Id.* at 269-70, 315 A.2d at 255. Taken together, these elements of *Branzburg* supported the conclusion that, when a reporter "legitimately entitled to First Amendment protection" objects to questions in a deposition proceeding in a criminal case, the reporter "is entitled to refuse to answer unless the interrogator can demonstrate to the judicial officer appealed to that there is no other adequately available source for the information and that it is relevant and material on the issue of guilt or innocence." *Id.* at 271, 315 A.2d at 256; see also *In re Inquest Subpoena (WCAX)*, 2005 VT 103, ¶ 14, 179 Vt. 12, 890 A.2d 1240 (holding that "[t]he balancing test adopted in *St. Peter* does not apply" in the context of a criminal inquest, the equivalent to the grand jury investigation in

*Branzburg,* and therefore a television station had no privilege, qualified or otherwise, to withhold unpublished videotape showing the commission of certain crimes).

¶ 11. Although both *Branzburg* and *St. Peter* concerned criminal proceedings, numerous courts have since extended the privilege to the civil context as well. As the Second Circuit Court of Appeals explained in *United States v. Burke*: "We see no legally-principled reason for drawing a distinction between civil and criminal cases when considering whether the reporter's interest in confidentiality should yield to the moving party's need for probative evidence." 700 F.2d 70, 77 (2d Cir. 1983); see also *Shoen v. Shoen,* 5 F.3d 1289, 1292 (9th Cir. 1993) (the qualified First Amendment shield "protects journalists against compelled disclosure in all judicial proceedings, civil and criminal alike"); *Riley v. City of Chester,* 612 F.2d 708, 716 (3d Cir. 1979) ("In striking the delicate balance between the assertion of the privilege . . . and the interest of either criminal or civil litigants seeking the information the materiality, relevance and necessity of the information sought must be shown.").

¶ 12. Although the decisions are not entirely uniform, many courts have also recognized that the reporter's privilege may extend to nonconfidential as well as confidential information. See *Gonzales v. National Broadcasting Co.,* 194 F.3d 29, 35 n.5 (2d Cir. 1999) (summarizing federal decisions that have recognized a reporter's privilege for nonconfidential press sources and material); *O'Neill v. Oakgrove Constr., Inc.,* 523 N.E.2d 277, 280 n.2 (N.Y. 1988) (noting that "courts have held the privilege necessary to protect nonconfidential materials as well"); see generally A. Wasserstrom, Annotation, *Reportorial Privilege as to Nonconfidential News Information,* 60 A.L.R.5th § 2[a], at 93 (1998) (observing that state and federal courts "in most cases" have applied a balancing of interests to determine whether the qualified reporter's privilege to withhold nonconfidential information has been overcome). In *Gonzales,* for example, the court acknowledged the important public interest in protecting a journalist's confidential sources and material but found that "there were also broader concerns undergirding the qualified privilege . . . regardless whether the information sought from the press is confidential." 194 F.3d at 35. These concerns include the risk that routine, unfettered access to press files would impose significant costs in time and resources for subpoena compliance, inhibit potential

sources absent a guarantee of confidentiality, encourage the destruction of potentially useful unpublished information, and transform journalists into an investigative arm of the legal system. *Id.*; see also *Shoen*, 5 F.3d at 1294-95 (discussing the justifications for "extending protection to non-confidential information"); *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) (noting "a lurking and subtle threat to journalists and their employers if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually, if not cavalierly, compelled").

¶ 13. Even while acknowledging these risks, however, courts have recognized that the threat to free-press interests in cases involving nonconfidential information is a fairly "subtle" one and relies more on intuition than empirical evidence demonstrating "how any chilling effect could result from the disclosure of statements made for publication without any expectation of confidentiality." *LaRouche*, 841 F.2d at 1181-82; see also *United States v. Smith*, 135 F.3d 963, 970-71 (5th Cir. 1998) (characterizing the media's fear that nonconfidential sources may shy away from the press as "speculative at best" and noting the absence of "empirical basis for assertions that the media will avoid important stories or destroy its archives" in response to discovery requests). Thus, many courts have held that while First Amendment interests may be implicated when litigants seek disclosure of unpublished nonconfidential information, those interests are relatively weaker. The absence of confidentiality therefore represents "an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production in a particular case." *Shoen*, 5 F.3d at 1295-96 (holding that "the absence of confidentiality may be considered in the balance of competing interests as a factor that diminishes the journalist's, and the public's, interest in non-disclosure"). Accord *Gonzales*, 194 F.3d at 36 (concluding that "when protection of confidentiality is not at stake, the privilege should be more easily overcome").

¶ 14. The case at bar, however, is distinguishable even from these decisions in one significant respect. Here the information sought not only lacked confidentiality, it was also available to virtually every other member of the public who attended the selectboard hearing and heard the statements made by the selectboard members. In contrast, *Shoen*, 5 F.3d at 1290, con-

cerned private — albeit nonconfidential — interviews conducted by an investigative author, while *Gonzales*, 194 F.3d at 31, involved unpublished videotape of a secretly recorded motor-vehicle stop unobserved by others. A number of courts have concluded that, where the information sought derives from the reporter's eyewitness observations of a public event, virtually no First Amendment interests are implicated and the qualified reporter's privilege simply does not apply. See, e.g., *Miller v. Mecklenburg County*, 602 F. Supp. 675, 679 (W.D.N.C. 1985) (when a reporter is questioned about events witnessed like any other member of the public "there is no intrusion into newsgathering or the special functions of the press"); *Alexander v. Chicago Park Dist.*, 548 F. Supp. 277, 278 (N.D. Ill. 1982) (holding that "[a] reporter's observations of a public place or event are no different in kind than that of other individuals; and . . . they are not entitled to constitutional protection."); *Kitzmiller . v. Dover Area Sch. Dist.*, 379 F. Supp. 2d 680, 687 (M.D. Pa. 2005) (same). Others, while applying the qualified privilege, have recognized that the First Amendment interest is particularly weak where the information sought consists of nonconfidential observations of events open to the public. See, e.g., *Carter v. City of New York*, No. 02 Civ. 8755, 2004 WL 193142, at *1 (S.D.N.Y. 2004) (unreported mem.) (holding that qualified privilege applied to reporter's observations of events at public demonstration while recognizing that nature of the information sought "is a factor to be considered in determining whether the privilege has been overcome"); *State v. Salsbury*, 924 P.2d 208, 213 (Idaho 1996) (applying balancing test under *Branzburg* to hold that disclosure of videotape of a "public event which was readily viewable to anyone present" would not result in chilling effect on newsgathering process); *Prince George's County v. Hartley*, 822 A.2d 537, 544 (Md. Ct. Spec. App. 2003) (holding that reporters could be compelled to provide nonconfidential information concerning events they witnessed where claimant showed that the information sought "would assist in ascertaining the truth" and that there was "no real alternative source of the information").

■ ¶ 15. Although the trial court here concluded otherwise, we are not persuaded that compelling the reporter's testimony in this case will unduly burden the newsgathering function of the press. No confidential sources or materials are at risk. No unpublished information, notes, or other resource materials that might infringe

on the newspaper's editorial autonomy are sought by plaintiff. Indeed, plaintiff seeks only to question the reporter about statements which the reporter heard at a hearing accessible to every other member of the public. In these circumstances, we perceive no undue burden on the newsgathering function of the press that might result from disclosure of the information.

¶ 16. The risk to which the trial court alluded concerning the potential "chilling" effect on the willingness of journalists to cover such public meetings does not strike us as realistic. In many cases, the local entity will have recorded the proceeding, thereby providing an objective, readily available alternative source and obviating the need for the reporter's testimony. Even where no recording is available, however, we do not regard the risk of the occasional subpoena for a reporter's testimony about events witnessed or statements heard at a public meeting to be an unreasonable burden for the press to bear. Absent tangible proof to the contrary, we are simply not persuaded that requiring such testimony will, in reality, deter the press from covering otherwise newsworthy public events. See *Salsbury*, 924 P.2d at 213 (observing that "[c]redibility balks at the idea" the media would stop covering news events because of the risk of a subsequent subpoena).

¶ 17. Even if we were to hold otherwise and apply a balancing analysis under the First Amendment, our conclusion would remain unchanged.[4] As we explained in *St. Peter*, a proper resolution of the privilege claim must balance any First Amendment interests at stake against the moving party's demonstrated interest in disclosure, an interest which must show at a minimum "that there is no other adequately available source for the information and that it is relevant and material" to a significant issue in the case, the civil equivalent of guilt or innocence. 132 Vt. at 271, 315 A.2d at 256. To recall, the only evidence that plaintiff is attempting to adduce is the reporter's testimony, under oath, as to precisely what he heard at the selectboard hearing. Plaintiff hopes thereby to confirm the statement attributed in the article to

---

[4] Although the trial court purported to find support for its ruling under both the First Amendment and Article 13 of the Vermont Constitution, as well as federal and state common law, *St. Peter* and most of the principal cases on which we rely are based on an implied privilege under the First Amendment, and we therefore restrict our holding to that clause.

Bruce Thompson, a selectboard member, to the effect that plaintiff's rival for the position was hired because "he's younger, so we can get a lot more service." Plaintiff argues that a disinterested witness able to recall Thompson's precise statement is not only relevant, but critical to his case, in order to rebut effectively the Town's anticipated defense that the same decision would have been made based solely upon plaintiff's extensive family ties to Town government.

¶ 18. The trial court found that the reporter's anticipated testimony was indeed relevant, and further acknowledged that the reporter "might remember the event differently from others, and he might also make a better witness." Nevertheless, the court concluded that the availability of other witnesses from the selectboard hearing negated plaintiff's claim that there was no "other adequately available source for the information," *St. Peter*, 132 Vt. at 271, 315 A.2d at 256, and therefore defeated his effort to override the privilege. In so holding, however, we believe the trial court significantly undervalued the reporter's potential testimony. Like many courts, we have recognized that eyewitness accounts often display discrepancies, in part because of various "psychological factors" that affect perception and memory. *State v. Percy*, 156 Vt. 468, 475-76, 595 A.2d 248, 252 (1990); see also *United States v. Brownlee*, 454 F.3d 131, 142 (3d Cir. 2006) (observing that "science has firmly established the inherent unreliability of human perception and memory") (quotations omitted); see generally T. Singer, *To Tell the Truth, Memory Isn't that Good*, 63 Mont. L. Rev. 337, 359 (2002) (reviewing the scientific literature showing that "[m]emory is inaccurate because it is not a recording process, like a video camera; rather, memory is primarily a reconstructive process."). As Justice Mosk succinctly observed in *Delaney v. Superior Court*: "[T]wo percipient witnesses of the same event are not in any sense fungible." 789 P.2d 934, 957 (Cal. 1990) (Mosk, J., concurring).

■ ¶ 19. Thus, a journalist's *observation* of an unrecorded, transitory event — such as the selectboard hearing in this case — is not the sort of objectively verifiable information that might typically be retrievable from an alternative source in the usual reporter's privilege case. Rather, owing to the vagaries of perception and memory, the reporter and the alternative witnesses here are not in any meaningful sense "alternative sources of the *same* information, but sources of *different* information." *Id.* (agreeing

with the majority holding that newspersons who witnessed an arrest were required to testify as to their observations) (initial emphasis added); see also *Hartley*, 822 A.2d at 544 (holding that police officer was entitled to reporters' testimony concerning remarks they had heard and quoted in articles "[b]ecause the information he seeks from the reporters is their contemporaneous observations of a transitory event" and thus "no real alternative source of the information exists"). Thus, contrary to the trial court's conclusion, the record here does not show that the other witnesses offered an adequate alternative source of the information sought.

■ ¶ 20. We therefore conclude that, even if the qualified privilege applied, plaintiff has satisfied the elements necessary to compel disclosure under *St. Peter*. The reporter's testimony concerning his contemporaneous perceptions of what transpired at the hearing cannot reasonably be obtained elsewhere. Furthermore, the information — purportedly consisting of Thompson's statement that plaintiff was not hired because the other candidate was younger and could work longer — is relevant to significant issues in the underlying case; it not only supports plaintiff's age-discrimination claim, but rebuts the Town's mixed-motive defense based on Thompson's other statements attributing the hiring decision to plaintiff's family connections. Plaintiff has demonstrated, in short, that he is entitled to the reporter's testimony here. In contrast, as noted, the reporter and newspaper have identified no risks from disclosure that pose — in our view — a realistic threat to the press's ability or willingness to cover public or newsworthy events such as the selectboard hearing in question.

¶ 21. Accordingly, we hold that the trial court's decision to quash plaintiff's subpoena was in error, and must be reversed. Although the Town asked the court to consider its separate subpoena, and to uphold its request for additional materials in the event that the reporter was permitted to testify, the court's ruling rendered it unnecessary to reach these matters. In view of our decision to reverse the court's ruling and permit the reporter to testify, we direct the court, on remand, to consider the Town's request.

*The judgment is reversed, and the case remanded for further proceedings consistent with the views expressed herein.*