2012 VT 24

## Rutland Herald v. Vermont State Police and Office of the Attorney General

[49 A.3d 91]

No. 10-434

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 30, 2012

---

*Robert B. Hemley* and *Matthew B. Byrne* of *Gravel and Shea, P.C.*, Burlington, for Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, and *Mark J. Di Stefano*, Assistant Attorney General, Montpelier, for Defendants-Appellees.

*Dan Barrett*, Montpelier, for Amicus Curiae American Civil Liberties Union Foundation of Vermont.

¶ 1. **Skoglund, J.** This case concerns public access to records that newspaper plaintiff Rutland Herald believes are of intense public interest: material related to a criminal investigation of possession of child pornography by employees of the Criminal Justice Training Council at the Vermont Police Academy. The Herald appeals from a trial court decision granting summary judgment to defendants, the Vermont State Police (VSP) and the Office of the Attorney General (collectively "the State"), and denying disclosure of the records under the Access to Public Records Act (PRA), 1 V.S.A. §§ 315-320. The court concluded that the records sought by the Herald, which included inquest records, were exempt from disclosure as "records dealing with the detection and investigation of crime" under § 317(c)(5). It added that the inquest materials were also exempt under § 317(c)(1) as "records which by law are designated confidential." We affirm the court's decision.

¶ 2. The material facts are undisputed. In January 2010, the VSP opened an investigation into possible criminal conduct involving employees of the Training Council. The VSP had been alerted to the possibility of criminal conduct by the Vermont Department of Human Resources (VDHR), which was conducting an employment-related investigation into the matter following the discovery of suspicious material on the work computer of employee David McMullen. Inappropriate emails were also apparently discovered on other employees' work computers. The employees' work computers were secured, and the VSP also seized computer equipment from McMullen's home. The following day, McMullen committed suicide. As a result, the VSP conducted an investigation into his death.

¶ 3. The VSP compiled several files during the course of its investigations, which included inquest-related material. When its investigations were complete, the VSP submitted its files to the Office of the Attorney General for prosecutorial review. The

Attorney General declined to commence a prosecution, finding no criminal conduct by anyone other than McMullen.

¶ 4. In July 2010, the Herald made a public records request to the VSP and to the Attorney General, seeking disclosure of materials related to the investigations of McMullen and other unnamed employees. The parties stipulated that the Herald sought access to both the criminal and death investigation files. The VSP denied the request, asserting that its files were exempt from disclosure under § 317(c)(5). The Attorney General denied the request on similar grounds, adding that the inquest materials were also exempt under § 317(c)(1) as records designated confidential by law.

¶ 5. The Herald filed suit in August 2010 and immediately requested summary judgment in its favor. The State opposed the Herald's request and filed a cross-motion for summary judgment. At the court's request, the State produced the withheld material for in camera review. Following oral argument and in camera review, the court granted summary judgment to the State. It concluded, with two minor exceptions,[1] that the records at issue related to the investigation of possible criminal activity and included "no material related to policy, employment practices, or other activities not directly related to a specific investigation." The court noted that § 317(c)(1) offered an additional ground for shielding the inquest materials from public view.

¶ 6. In reaching its conclusion, the court rejected the Herald's argument that because any investigation of McMullen ended with his suicide, there was no basis for a continuing exemption to disclosure. The court similarly rejected the Herald's contention that the phrase "compiled in the course of a criminal . . . investigation" in § 317(c)(5) meant that any exception to disclosure was limited to the duration of the investigation. The court concluded that the statutory language contained no time limit and that it instead contemplated an "open-ended period of confidentiality." The Herald now appeals from the court's decision.

¶ 7. We review a grant of summary judgment de novo, using the same standard as the trial court. *Shlansky v. City of Burlington*, 2010 VT 90, ¶ 6, 188 Vt. 470, 13 A.3d 1075. Summary judgment is

---

[1] These minor exceptions included a press release and an email announcement, which the court found were related to "management and direction of a law enforcement agency" and therefore disclosable. 1 V.S.A. § 317(c)(5).

appropriate if there are no issues of material fact and a party is entitled to judgment as a matter of law. *Id.*; V.R.C.P. 56(c)(3).

¶ 8. As we have repeatedly recognized, the PRA represents "a strong policy favoring access to public documents and records." *Wesco, Inc. v. Sorrell*, 2004 VT 102, ¶ 10, 177 Vt. 287, 865 A.2d 350. The PRA's statement of policy specifically provides that:

> It is the policy of this subchapter to provide for free and open examination of records consistent with Chapter I, Article 6 of the Vermont Constitution. Officers of government are trustees and servants of the people and it is in the public interest to enable any person to review and criticize their decisions even though such examination may cause inconvenience or embarrassment. All people, however, have a right to privacy in their personal and economic pursuits, which ought to be protected unless specific information is needed to review the action of a governmental officer. Consistent with these principles, the general assembly hereby declares that certain public records shall be made available to any person as hereinafter provided. To that end, the provisions of this subchapter shall be liberally construed with the view towards carrying out the above declaration of public policy.

1 V.S.A. § 315.

¶ 9. The public interest in knowing what the government is doing "is particularly acute in the area of law enforcement." *Caledonian-Record Publ'g Co. v. Walton*, 154 Vt. 15, 21, 573 A.2d 296, 299 (1990). Of course, the State also has "significant interests in protecting the public from criminal activity, prosecuting those who commit crimes, and protecting the privacy rights of individual citizens," and "[t]hese interests may, at times, override the interest in public disclosure." *Id.* at 21, 573 A.2d at 300. We construe exemptions in the PRA "strictly against the custodians of records," and resolve any doubts "in favor of disclosure." *Wesco*, 2004 VT 102, ¶ 10. The burden of demonstrating that a record is covered by an exemption "is on the agency seeking to avoid disclosure." *Id.*

¶ 10. Section 317(c)(5) specifically exempts the following material from disclosure:

[R]ecords dealing with the detection and investigation of crime, including those maintained on any individual or compiled in the course of a criminal or disciplinary investigation by any police or professional licensing agency; provided, however, records relating to management and direction of a law enforcement agency and records reflecting the initial arrest of a person and the charge shall be public.

As stated above, the trial court inspected the records here and concluded that they were "records dealing with the detection and investigation of crime." The Herald has not challenged this threshold determination, and we accept the trial court's characterization of these records.[2]

---

[2] The Herald does challenge the way in which the trial court conducted its review of the documents at issue. The court indicated that the records provided included three compact discs (CDs), which the court did not review but nonetheless described as "appear[ing] to include" interviews and the results of forensic computer searches. The court explained that the materials on the CDs "were obtained by the criminal investigators assigned to the case and form part of the records of that investigation." It found the content of the CDs consistent with the markings on the CDs and the general description of the investigation. The Herald argues that the trial court could not have described the CDs without reviewing them. We have reviewed the material on the CDs and find the trial court's description accurate.

The Herald also challenges the trial court's conclusion that the State produced all of the records requested for in camera inspection. An assistant attorney general and the chief criminal investigator for the VSP submitted affidavits describing the records subject to the Herald's request under the PRA. Our review indicates that the records described in the affidavits were provided to the trial court for in camera inspection.

The Herald is particularly concerned that no records from the VDHR investigation are in the files inspected by the trial court. There is no indication that the VSP had access to the records of the VDHR investigation; neither affidavit indicates that these records were part of the investigatory files as prepared by the VSP or reviewed by the Attorney General's office. The Herald never sought these records directly from the VDHR. For this reason, the trial court properly concluded that the VDHR files were outside the scope of the Herald's PRA request.

The Herald suggests that the trial court should have ordered the State to produce a *Vaughn* index of the records produced. We do not believe that a *Vaughn* index is necessary, or would even be helpful, where the records fall under a categorical exemption from public access. See *Church of Scientology v. IRS*, 792 F.2d 146, 152 (D.C. Cir. 1986) ("When . . . a claimed [Freedom of Information Act, 5 U.S.C. § 552 (FOIA)] exemption consists of a generic exclusion, dependent upon

¶ 11. We thus turn to the Herald's statutory arguments. The Herald asserts that disclosure is appropriate because the investigation is complete, and the public interest favors disclosure. Citing *Walton*, 154 Vt. at 19, 573 A.2d at 299, the Herald contends that this Court has narrowly construed § 317(c)(5) in the past and found that the statute contains a "time-based" element. To achieve a narrow construction in this case, the Herald urges us to apply a balancing test as in *Trombley v. Bellows Falls Union High School District No. 27*, and weigh "the right of persons 'to privacy in their personal . . . pursuits' against the need for 'specific information . . . to review the action of a governmental officer.'" 160 Vt. 101, 109-10, 624 A.2d 857, 863 (1993) (citing 1 V.S.A. § 315). The Herald maintains that there are no privacy interests at stake because the target of the investigation has been identified and is dead, and the remaining employees have no expectation of privacy in an investigative report of their on-the-job behavior. It argues that the completion of the investigation heightens the public interest in the matter. The Herald cites cases from other jurisdictions that allow the release of similar material.

 ¶ 12. In construing § 317(c)(5), our primary goal is "to discern and give effect to the intent of the Legislature." *State v. O'Neill*, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996). We look first to the plain meaning of statutory language, and if the plain meaning resolves the interpretation issue, we generally look no further. *Sawyer v. Spaulding*, 2008 VT 63, ¶ 7, 184 Vt. 545, 955 A.2d 532 (mem.). As discussed below, we find no support for the imposition of either a time-based limitation or a balancing test in the plain language of § 317(c)(5). The language instead reflects the Legislature's intent to permanently and categorically exempt all criminal investigatory records from public disclosure.

---

the category of records rather than the subject matter which each individual record contains, resort to a *Vaughn* index is futile."). The term *Vaughn* index arose from *Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973), where the United States Court of Appeals stated that,

> [e]ven if isolated portions of the document are exempt under more than one exemption, it is preposterous to contend that all of the information is equally exempt under all of the alleged exemptions. It seems probable that some portions may fit under one exemption, while other segments fall under another, while still other segments are not exempt at all and should be disclosed. The itemization and indexing that we herein require should reflect this.

¶ 13. As set forth above, the statute exempts "records dealing with the detection and investigation of crime, including those *maintained* on any individual or *compiled* in the course of a criminal or disciplinary investigation." 1 V.S.A. § 317(c)(5) (emphases added). Investigation records are "maintained" or kept on individuals on an ongoing basis, after active "detection and investigation" is complete. Using the past tense of "compile" indicates intent to exempt records both during and after the compilation process. The words "maintained" and "compiled" suggest that the Legislature anticipated keeping investigatory records exempt after an active investigation had ended. Like the trial court, we are not persuaded by the Herald's argument that the use of the word "compiled" suggests that the exception ends when the compilation process ends. The term "compiled" describes the type of record involved.

¶ 14. We note, moreover, that had the Legislature intended the exemption to exist only during an ongoing investigation, it could have been much more specific. For example, 1 V.S.A. § 317(c)(13) exempts "information pertaining to the location of real or personal property for public agency purposes *prior to public announcement of the project* and information pertaining to appraisals or purchase price of real or personal property for public purposes *prior to the formal award of contracts thereof*." (Emphases added.) The PRA also contains other exemptions with specific temporal limitations. See, e.g., *id.* § 317(c)(14) (exempting "records which are relevant to litigation to which the public agency is a party of record, provided all such matters shall be available to the public after ruled discoverable by the court before which the litigation is pending, but in any event *upon final termination of the litigation*" (emphasis added)); *id.* § 317(c)(23) (exempting records related to research and activities conducted at state academic institutions "*until* such data, records or information are *published, disclosed* in an issued patent *or publicly released* by the institution or its authorized agents" (emphases added)). That the Legislature included temporal limitations in numerous other PRA exemptions makes it unlikely that it intended to include a temporal limitation in § 317(c)(5) without specific language to this effect.

¶ 15. The Herald asserts that the strong policy in favor of public oversight of law enforcement actions must lead to a different result. It argues that the Legislature could not have intended that records relating to the investigation and detection of

crime be confidential forever. Policy arguments such as these "are for the Legislature and not this Court, and we must implement the statute as it is written." *Butson v. Dep't of Emp't & Training,* 2006 VT 10, ¶ 7, 179 Vt. 599, 892 A.2d 255 (mem.).

¶ 16. The Herald also cites *Walton,* 154 Vt. 15, 573 A.2d 296, and *Trombley,* 160 Vt. 101, 624 A.2d 857, in support of its arguments. We do not find sufficient support for the Herald's position in these decisions. In *Walton,* we considered whether the Department of Public Safety and the Town of St. Johnsbury were required to disclose the names of individuals who had been issued citations. The defendants argued that the citations were exempt from disclosure under 1 V.S.A. § 317(c)(5) as "records dealing with the detection and investigation of crime." We rejected this argument, categorizing such records as the "product" of an investigation, rather than a record of such investigation. *Walton,* 154 Vt. at 28, 573 A.2d at 303.

¶ 17. The Herald asserts that our decision reflects the presence of a time-based element in § 317(c)(5) because the decision was based, in part, on the timing associated with an arrest, which occurs after the investigation of a crime. It reasons that the records here similarly should fall outside the terms of the exemption because the "detection and investigation of [the] crime" is complete.

¶ 18. We reject these arguments. In *Walton,* we looked to the nature of a citation record in considering the threshold question of whether the records at issue dealt with the investigation or detection of crime; that point is uncontested here. Obviously, the records here could not be classified as the "product" of an investigation, as in *Walton,* without completely ignoring the relevant statutory language and obviating the purpose of the exemption. We presume that the Legislature did not intend such an absurd result. *TD Banknorth, N.A. v. Dep't of Taxes,* 2008 VT 120, ¶ 32, 185 Vt. 45, 967 A.2d 1148 (presumption against statutory construction that leads to absurd results). Neither the reasoning of *Walton,* nor its result, determines whether § 317(c)(5) contains an unstated temporal limitation for purposes of disclosing investigation records.

¶ 19. The Herald also cites numerous opinions from other jurisdictions as supporting its argument for a temporal limitation on investigative material. In fact, decisions from other jurisdictions support the interpretation we have adopted. The difficulty in using

such decisions is that, although states have adopted equivalents to the PRA, the language of the statutes varies widely. Thus, many of the cases cited by the Herald involve statutory provisions with qualifying language not present in § 317(c)(5). See, e.g., *Christy v. Palm Beach Cnty. Sheriff's Office*, 698 So. 2d 1365, 1366-67 (Fla. Dist. Ct. App. 1997) (considering "exemptions from disclosure . . . for *active* criminal intelligence information and *active* criminal investigative information," and concluding "[t]here is nothing in the record to suggest that the information contained in the file is active" (quotations omitted and emphases added)); *Rafuse v. Stryker*, 813 N.E.2d 558, 560 n.3 (Mass. App. Ct. 2004) (considering statute that exempts "investigatory materials necessarily compiled out of the public view by law enforcement . . . the disclosure of which materials *would probably so prejudice the possibility of effective law enforcement* that such disclosure would not be in the public interest" (emphasis added)); *Linzmeyer v. Forcey*, 646 N.W.2d 811, 816 (Wis. 2002) (considering statute that limits exemption to records containing identifiable information that "is collected or maintained in connection with a complaint, investigation or other circumstances that *may lead to an enforcement action*" and concluding that the exemption does not apply "where the investigation has been closed and where it has been confirmed that there is no chance that the Report will lead to an enforcement action" (citation omitted and emphasis added)).[3] Thus, they show us how the Legislature could have addressed the Herald's policy concerns, but did not.

---

[3] Other cases the Herald cites are distinguishable because they involve exemptions pertaining to records other than those related to criminal investigations. See, e.g., *Fincher v. State*, 497 S.E.2d 632, 635-36 (Ga. Ct. App. 1998) (considering situation where state board released investigatory report, unrelated to criminal or civil charges, concerning claims that plaintiff had engaged in misconduct while in board's employment, and finding no blanket exclusion exempting personnel records from disclosure and no other applicable exceptions); *State of Hawai'i Org. of Police Officers v. Soc'y of Prof'l Journalists*, 927 P.2d 386, 391 (Haw. 1996) (applying Hawai'i law that excepted from the general disclosure requirement "[g]overnment records which, if disclosed, would constitute a clearly unwarranted invasion of personal privacy" (citation omitted)); *Fed. Publ'ns, Inc. v. Boise City*, 915 P.2d 21, 24-25 (Idaho 1996) (deciding that an "administrative review" authored by person in charge of police department's office of professional standards is not exempt from disclosure); *Worcester Telegram & Gazette Corp. v. Chief of Police of Worcester*, 787 N.E.2d 602, 605 (Mass. App. Ct. 2003) (noting that "investigatory exemption" was not asserted, and recognizing that issue was whether material in question falls under exemption for "personnel [file] or information").

¶ 20. More helpful are decisions that have determined that, in the absence of specific temporal language, there is no temporal limitation on an exemption of disclosure of records related to the detection or investigation of crime. For example, in *Williams v. Superior Court*, the Supreme Court of California considered a newspaper's request for access to a sheriff's records of disciplinary proceedings against two deputies. 852 P.2d 377 (Cal. 1993). The court was required to interpret a subdivision of the California Public Records Act that exempted from disclosure "investigatory or security files compiled by [a] state or local police agency" and "investigatory or security files compiled by any other state or local agency for correctional, law enforcement, or licensing purposes." *Id.* at 384 (citation omitted). Considering the statute's language, the court found it "noteworthy that nothing therein purports to place a time limit on the exemption for investigatory files." *Id.* at 390.

¶ 21. The court ultimately held that, according to its terms, "the exemption for investigatory files does not terminate with the conclusion of the investigation. Once an investigation . . . has come into being . . . materials that relate to the investigation and, thus, properly belong in the file, remain exempt subject to the terms of the statute." *Id.* at 393.[4] Courts from other jurisdictions have reached similar conclusions. See, e.g., *State ex rel. Polovischak v. Mayfield*, 552 N.E.2d 635, 637-38 (Ohio 1990) (considering statute exempting from disclosure "[c]onfidential law enforcement investigatory records," defined as "any record that pertains to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature, but only to the extent that the release of the record would create a high probability of disclosure" of certain specified criteria, and finding that the absence of evidence of enforcement activity is not "necessarily fatal" to exemption and rejecting the notion that "mere passage of time without resulting enforcement action places the record into the public realm" even if the investigation was no longer open (citation and emphasis

---

[4] The court did note, however, that this matter deserved legislative attention. It recognized that while there were good reasons for maintaining the confidentiality of investigatory records even after an investigation has ended, "those reasons lose force with the passage of time. Public policy does not demand that stale records be kept secret when their disclosure can harm no one, and the public good would seem to require a procedure by which a court may declare that the exemption for such records has expired." *Williams*, 852 P.2d at 393 n.13.

omitted)); cf. *Rural Hous. Alliance v. U.S. Dep't of Agric.*, 498 F.2d 73, 79-80 (D.C. Cir. 1974) (considering provision in federal Freedom of Information Act, which exempts from disclosure "investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency," and concluding that the government "need not show imminent adjudicatory proceedings or the concrete prospect of enforcement proceedings," rather, it must show "that the investigatory files were compiled for adjudicative or enforcement purposes" (citations and emphasis omitted)). We are thus not persuaded by the cases cited by the Herald.

¶ 22. We have a similar reaction to *Trombley*. *Trombley* involved a different exemption than that at issue here, specifically, 1 V.S.A. § 317(c)(7), which exempts, in relevant part, "personal documents relating to an individual, including information in any files maintained to hire, evaluate, promote or discipline any employee of a public agency." We read this exemption to prohibit disclosure of "personal documents," wherever such documents are filed. *Trombley*, 160 Vt. at 108, 624 A.2d at 862. In other words, documents are evaluated under this exemption based on their *content*, and not simply whether they have been included in a particular type of file.

¶ 23. In reaching our conclusion, we found the term "personal documents" to be vague and potentially limitless. *Id.* at 109, 624 A.2d at 863. "In its broadest sense," we explained, the term would include "any document about specific people," including most court opinions. *Id.* Because such a construction would consume the disclosure rule, we limited the exemption to instances where disclosure would invade personal privacy. *Id.* We recognized that § 317(c)(7) did not explicitly contain a privacy proviso, but we found support for incorporating such a provision in the PRA's statement of general policy. *Id.* at 109-10, 624 A.2d at 863; see 1 V.S.A. § 315 (recognizing the right of persons "to privacy in their personal . . . pursuits" which ought to be protected unless "specific information is needed to review the action of a government officer"). We thus directed the trial court to balance the public interest in disclosure against the harm to the individual in determining whether specific records should be released under that exemption. *Trombley*, 160 Vt. at 110, 624 A.2d at 863 (explaining that statute exempts "personal documents only if they reveal intimate details of a person's life, including any information

that might subject the person to embarrassment, harassment, disgrace, or loss of employment or friends" (quotation omitted)); see also *Kade v. Smith*, 2006 VT 44, ¶ 8, 180 Vt. 554, 904 A.2d 1080 (mem.) (similarly directing trial court to balance interests in privacy and disclosure in deciding if performance evaluations should be disclosed under § 317(c)(7), including considering the relevance, if any, of the records to the public interest for which they are sought, and any other factors that may affect the balance).

■ ■ ¶ 24. The Herald urges us to adopt a similar balancing test here. Unlike *Trombley*, however, we do not find the language used in § 317(c)(5) to be "vague and potentially limitless." Instead, we read this provision to reflect the Legislature's specific intent to permanently shield all "records dealing with the detection and investigation of crime, including those maintained on any individual or compiled in the course of a criminal or disciplinary investigation by any police or professional licensing agency." The statute is broadly worded and it provides a categorical exemption for such records irrespective of their specific content. See *Caledonian-Record Publ'g Co. v. Vt. State Colls.*, 2003 VT 78, ¶ 9, 175 Vt. 438, 833 A.2d 1273 (reaching similar conclusion as to exemption for "student records," explaining that while term was undefined, the language of the exception was broad and unqualified, and nothing in the PRA suggested any "content-based restrictions limiting the exception, for example, to student academic performance, financial aid, or other strictly scholastic subjects, or excluding records relating to violations of the student ethics code or the criminal law"). It is not appropriate under these circumstances to read a balancing test into the statute. See *O'Neill*, 165 Vt. at 275, 682 A.2d at 946 ("It is inappropriate to read into a statute something which is not there unless it is *necessary* in order to make the statute effective.").

■ ¶ 25. Because § 317(c)(5) provides a record-based, rather than content-based, limitation, we also reject the Herald's argument that the court could release investigatory records but require redaction of information. The Herald cites two cases where we directed the trial court to consider releasing redacted versions of records. Both involved the "personal documents" exemption at issue in *Trombley*. See *Kade*, 2006 VT 44, ¶ 14; *Norman v. Vt. Office of Court Adm'r*, 2004 VT 13, ¶ 7, 176 Vt. 593, 844 A.2d 769 (mem.).

■ ¶ 26. As reflected above, *Trombley* specifically required the court to weigh the public interest in disclosure against the privacy interest in the information involved. 160 Vt. at 110, 624 A.2d at 863. This is necessarily an information-based balancing process that lends itself to the use of redaction to keep confidential only the information that invades individual privacy. See *Kade*, 2006 VT 44, ¶ 14. The exception in § 317(c)(5) is not information-based. There is no balancing process involved in the implementation of § 317(c)(5) and no statutory standards the court could use to determine what information to disclose and what to redact. Redaction does not apply.

¶ 27. Finally, we reject the Herald's argument that the records at issue must be disclosed because they "relat[e] to [the] management and direction of a law enforcement agency." 1 V.S.A. § 317(c)(5). According to the Herald, any investigation into illegal activity by law enforcement individuals, by definition, falls within this proviso. This is so, the Herald maintains, because the target of the investigation is not an ordinary citizen but someone who is responsible for seeing that the laws are faithfully executed.

■ ¶ 28. The Herald's interpretation finds no support in the plain language of the statute or in its legislative history. The statute draws no distinction between those records that deal with a criminal investigation of a police officer, and those involving a criminal investigation of other citizens.[5] Classifying the records here as falling within the management proviso would obviate the language that specifically addresses and exempts records dealing with the detection and investigation of crime. It would swallow the

---

[5] We note that the Legislature has created a process designed "to ensure that allegations of misconduct by state police officers are investigated fully and fairly, and to ensure that appropriate action is taken with respect to such allegations." 20 V.S.A. § 1923(a). The office of internal affairs within the Department of Public Safety is charged with investigating "all allegations of misconduct by members of the department," and the head of the internal affairs unit must report all allegations and findings to the commissioner as well as to the "state's attorney of the county in which the incident took place, to the attorney general and to the governor, unless the head of the unit makes a determination that the allegations do not include violation of a criminal statute." *Id.* § 1923(b). The Legislature has specifically exempted "records of the office of internal investigation of the department of public safety" from public view. 1 V.S.A. § 317(c)(18); see also *id.* § 317(c)(1) (exempting from disclosure "records which by law are designated confidential"); 20 V.S.A. § 1923(d) (stating that records of the office of internal investigation shall be confidential with exceptions not relevant here).

exemption. See *State v. Tierney*, 138 Vt. 163, 165, 412 A.2d 298, 299 (1980) (in construing a statute, Court considers it "as a whole, and, if possible, gives effect to every word, clause and sentence").

¶ 29. Nothing in the legislative history compels a contrary conclusion, or shows that the management proviso was intended to make public actual investigation files such as those at issue here. As the trial court found, the records here were directly related to a specific investigation; they were not related to policy, employment practices, or other activities that would fall within a common sense understanding of the term "management and direction of a law enforcement agency."

¶ 30. Having found the investigatory files entitled to a blanket exemption under 1 V.S.A. § 317(c)(5), we need not consider whether certain materials within the files are *also* exempt under § 317(c)(1) (exempting "records which by law are designated confidential or by a similar term"). As set forth above, we do not engage in a content-based analysis of these records once they have been determined to be "records dealing with the detection and investigation of crime." Such records are wholly exempt from public access. We therefore do not address the Herald's arguments concerning inapplicability of the inquest secrecy statute, 13 V.S.A. § 5134, to the general disclosure exemption in 1 V.S.A. § 317(c)(1) for records designated confidential by law.[6]

¶ 31. No party argued below, nor do they argue on appeal, that the inquest records are judicial branch records that must be disclosed under the Rules for Public Access to Court Records (PACR). This novel issue is raised sua sponte by the dissent without notice or opportunity for briefing and argument by the parties. It is unnecessary and inappropriate to reach this issue here. See *State v. Taylor*, 145 Vt. 437, 439, 491 A.2d 1034, 1035 (1985) ("It is only in the rare and extraordinary case that this Court will consider, sua sponte, issues not properly raised on appeal before us."); *State v. Settle*, 141 Vt. 58, 61, 442 A.2d 1314, 1315 (1982) ("We have held, and we reiterate here that, in all but a few exceptional instances, matters which are not briefed will not be considered on appeal.").

¶ 32. As set forth above, this appeal involves a PRA request made to the VSP and the Office of the Attorney General for

---

[6] The Herald's January 2011 motion requesting the release of inquest materials pursuant to 13 V.S.A. § 5134 is also denied.

materials possessed by those entities. See 1 V.S.A. § 317(b) (defining "public record" as "any written or recorded information, regardless of physical form or characteristics, which is produced or *acquired* in the course of public agency business" (emphasis added)). We are not here considering an appeal from a superior court clerk's denial of a request for judicial branch records. See PACR 6(f)-(h) (describing inspection process for "case records" and setting forth procedure by which person aggrieved by decision made by a "case record custodian" with respect to a request for access to a "case record" can appeal).[7]

¶ 33. The Herald last asserts that if we construe the PRA to bar disclosure of the records sought here, we must conclude that the exemption for records dealing with the detection and investigation of crime is unconstitutional as applied in this case. It claims that the Vermont Constitution, particularly Chapter I, Article 6, mandates disclosure. The Herald contends that, if we construe the PRA to prevent disclosure, we should conclude that the exemption for records dealing with the detection and investigation of crime is unconstitutional as applied in this case. The State responds that all constitutional arguments made by the Herald on appeal were insufficiently raised before the trial court. We will not entertain arguments on appeal if they were not preserved in the trial court. *Progressive Ins. Co. v. Brown*, 2008 VT 103, ¶ 8, 184 Vt. 388, 966 A.2d 666. In order to preserve an argument, a party must present an argument "with specificity and clarity." *Id.* (quotation omitted).

¶ 34. Although it would have been preferable that the Herald raise its constitutional arguments more pointedly below, we do find it appropriate to address these arguments. The Herald explicitly devoted multiple paragraphs, both in its initial complaint, and in its motion for summary judgment, to the Vermont and Federal Constitutions. These arguments made sufficiently clear

---

[7] The dissent's characterization of the Herald's supposed "preservation" of this point on appeal is overly generous and mistaken. See *post*, ¶¶ 48-50. The Herald's single sentence in its Opposition to Summary Judgment that the inquest secrecy statute must be read in conjunction with 4 V.S.A. § 693, promoting, in the Herald's words, "a general rule of openness for court records" hardly preserves a claim on appeal for trial court production of inquest records. Nor did its argument that the court "release" the same records, in the explicit context of demanding the records from the state police or Attorney General, adequately raise a claim that the court itself should have disclosed the records directly.

that the Herald believed that the PRA must be interpreted in light of the constitutional issues implicated.

¶ 35. We understand the Herald's constitutional argument to be part of the Herald's more general argument that the PRA should not be interpreted to prevent public access here. In this light, the constitutional issues are not easily segregated from the question of statutory interpretation, which we considered above. Although the Herald has drawn more attention to the constitutional issues on appeal, it is not surprising that an argument presented as a matter of constitutional avoidance in a trial court should take on the complexion of a contingent argument for unconstitutionality at the appellate level. In light of all these considerations and the fact that the constitutional issues were briefed by both sides, we find it appropriate to address them here.

¶ 36. We reject the Herald's argument that the Vermont Constitution itself mandates disclosure in this case. The Herald relies primarily on Chapter I, Article 6, of the Vermont Constitution, which states, "[t]hat all power being originally inherent in and consequently derived from the people, therefore, all officers of government, whether legislative or executive, are their trustees and servants; and at all times, in a legal way, accountable to them." This Article represents a core statement of founding principles. The provision was originally present in the Vermont Constitution of 1777, ch. I, art. 5, having there been lifted nearly verbatim from the Pennsylvania Constitution of 1776. Pa. Const. of 1776, Declaration of Rights, cl. IV. The framers of the Pennsylvania Constitution drew their inspiration, in turn, from the Virginia Constitution of 1776, drafted by George Mason, which provided "[t]hat all power is vested in, and consequently derived from, the people; that magistrates are their trustees and servants, and at all times amenable to them." Va. Const. of 1776, Bill of Rights, § 2.

¶ 37. Precisely because of its broad significance as a statement of principle, Article 6 is not the source for mandating disclosure in this case. Article 6 does not provide the specificity necessary to create legal entitlements with definite character. See *Benning v. State*, 161 Vt. 472, 477, 641 A.2d 757, 759 (1994) ("The specific words on which plaintiffs rely lack the specificity that would show the presence of concrete rights applicable to these circumstances."); *State v. Carruth*, 85 Vt. 271, 273-74, 81 A. 922,

923 (1911) ("Many things contained in the bill of rights found in our State Constitutions are not, and from the very nature of the case cannot be, so certain and definite in character as to form rules for judicial decisions; and they are declared rather as guides to the legislative judgment than as marking an absolute limitation of power." (quotation omitted)); see also P. Teachout, *"Trustees and Servants": Government Accountability in Early Vermont*, 31 Vt. L. Rev. 857, 863 (2007) ("What the Vermont framers gave us when they declared that government officials were to be accountable to the people was not an idea with fixed political content but rather commitment to a vision.").

 ¶ 38. For this reason, we have explained that Article 6 cannot normally be the basis for judicially enforceable rights. "Article 6 is but a truism of a republican form of government, and provides no private right of action. The remedy contemplated by it is that of popular election." *Welch v. Seery*, 138 Vt. 126, 128, 411 A.2d 1351, 1352 (1980). Accordingly, this Court has never issued relief solely on the basis of Article 6.[8] Cf. *Benning*, 161 Vt. at 476-77, 641 A.2d at 759 (noting that the Court had never "struck down an act of the Vermont Legislature solely because of a violation of Article 1"). Other states have similarly viewed their analogous constitutional provisions. See, e.g., *Kerpelman v. Bd. of Pub. Works*, 276 A.2d 56, 61 (Md. 1971) (stating that the Maryland constitutional provision that "persons invested with the legislative or executive powers of Government are Trustees of the Public, and, as such, accountable for their conduct" is "hortatory in nature").

---

[8] The Herald's argument to the contrary is based on a misreading of *Clement v. Graham*, 78 Vt. 290, 63 A. 146 (1906). In that case, we found that a 1904 law required that the Auditor of Accounts was required to keep and make public certain records. Article 6 was invoked in considering whether any taxpayer or citizen would be entitled to seek a writ of mandamus to enforce this statutory duty of the Auditor. See *id.* at 316-18, 63 A. 146. We held that Article 6 did not create an affirmative duty on the part of a public official, but merely specified to whom the statutory duty of a public official was owed. Cf. *Pa. State Univ. v. State Emps.' Ret. Bd.*, 935 A.2d 530, 537 (Pa. 2007) (invoking the analogous Pennsylvania constitutional provision to conclude that the general public is not a mere third-party with regard to disclosure of public records). Unlike in that case, the Herald here seeks to use Article 6 to create a duty to disclose on the part of the State. Cf. *Buttolph v. Osborn*, 119 Vt. 116, 118, 119 A.2d 686, 687 (1956) ("The petitioners cite *Clement v. Graham*. This at once brings us to the question: Is there any statute, or statutes, imposing a duty as claimed by the petitioners?" (citation omitted)).

■ ¶ 39. This is not to say that Article 6 must be entirely without practical significance, but rather "the article is not self-executing." *Shields v. Gerhart*, 163 Vt. 219, 230, 658 A.2d 924, 932 (1995) (citations omitted). Because Article 6 provides general guiding principles rather than specific rights, direct judicial enforcement could occur only where the Legislature has acted so entirely contrary to the Article as to positively do violence to the vision of government described therein. The Legislature certainly may, in contrast, realize the general aims of Article 6 with more concrete rights by enacting legislation like the PRA. See *Rowe v. Brown*, 157 Vt. 373, 377, 599 A.2d 333, 336 (1991) ("[F]or enforcement of the constitutional maxim, other than popular election, plaintiffs must avail themselves of the legislative enactments giving effect to Article 6."); *Welch*, 138 Vt. at 128, 411 A.2d at 1352 ("The maxim embodied in Article 6 is nevertheless given effect through multifarious legislative enactments."). In *Town of Brattleboro v. Garfield*, we noted that Vermont's Open Meeting Law is one such implementation of Article 6. 2006 VT 56, ¶ 16, 180 Vt. 90, 904 A.2d 1157. The PRA also states that it is an implementation of Chapter I, Article 6. See 1 V.S.A. § 315.

■ ■ ¶ 40. To say that Article 6 is not self-executing is to say that the Legislature may select the means and details of executing the broad principles articulated in Article 6. Thus, the realization of Article 6's philosophical vision is subject to those reasonable practical contours that the Legislature should set forth. To the extent that § 317(c)(5) exempts from disclosure the records in this case, the Legislature has determined that the principle embodied in Article 6 does not mandate disclosure. We will not second-guess that determination.

*Affirmed.*

¶ 41. **Dooley, J.,** concurring in part and dissenting in part. I concur with the majority decision that 1 V.S.A. § 317(c)(5) exempts from public access executive branch records dealing with the detection and investigation of crime, even if the criminal investigation is complete. I think that result is required by the wording of the statute, irrespective of the policy arguments of the Herald. I also do not believe the statute, so construed, violates Article 6 of Chapter I of the Vermont Constitution. I add only that the exemption appears overbroad and prevents public oversight of how law enforcement officials do their job, even in instances where

there is no reason for secrecy — such as protecting confidential sources of information. I urge the Legislature to reexamine the wording of the exemption.

¶ 42. I also agree that the proviso in § 317(c)(5) for "records relating to management and direction of a law enforcement agency" does not apply here, although for reasons different from the majority. The Herald's assertion that the Legislature may have wanted transparency if the investigation of crime involves investigating the actions of a law enforcement agency or its employees is plausible. Thus, I do not agree with the majority's conclusion that the Herald's position would "swallow the exemption." *Ante*, ¶ 28.

¶ 43. The fundamental difficulty that I have with the Herald's argument is that it is based on an underlying understanding that the "law enforcement agency" in the language is the agency being investigated rather than the agency conducting the investigation. Probably the most obvious reason that this understanding is incorrect is that the proviso covers only records related to the management and direction of the agency. If the Herald's construction were correct, the proviso would cover any criminal activity by the agency and be directed primarily at incidents of criminal activity rather than at the management and direction of the agency. Indeed, in this case, the Herald struggles to demonstrate how the criminal investigation was of the management of the police academy rather than the criminal activity of one or more employees.

¶ 44. I believe the proper construction is that the law enforcement agency in the proviso is the agency conducting the investigation. The proviso is needed because the exemption from public access is so broad. Since the purpose of a law enforcement agency is the investigation of crime, the wording of § 317(c)(5) threatens to make opaque all records of the agency — even those that do not involve investigation of particular cases. Thus, the proviso is needed to give public access to records that do not deal with the investigation of particular cases but instead with the overall management and direction of the agency. Portions of the legislative history of § 317(c)(5), provided by the Herald in its brief, demonstrate that the proviso was added at the urging of the Vermont Public Interest Research Group (VPIRG) exactly for this

purpose.[9] Since the records the Herald seeks do not relate to the management and direction of the VSP, the proviso does not apply.

¶ 45. This brings me to my main disagreement with the majority's decision — its conclusion that the inquest records are not publicly accessible in this case. I particularly disagree with the majority's rationale for its holding — "No party argued below, nor do they argue on appeal, that the inquest records are judicial branch records that must be disclosed under the Rules for Public Access to Court Records (PACR)." *Ante*, ¶ 31. This is a rationale that was not used by the superior court or raised by defendants. It exactly fits the majority's characterization of this dissent — it is a "novel issue" "raised sua sponte" "without notice or opportunity for briefing and argument by the parties." *Ante*, ¶ 31.

¶ 46. It is also wrong. In fact, the Herald argued both in this Court and in the superior court that the inquest records are judicial records that must be disclosed. The fact that they did not cite the Rules for Public Access to Court Records is irrelevant because those rules made no change in the law with respect to inquest records. I believe that we should decide this case by reviewing the rationale employed by the trial court and deciding this issue on the merits.

---

[9] Initial drafts of § 317(c)(5) did not include a proviso related to management and direction of a law enforcement agency. The addition of such a proviso was originally suggested by a representative from VPIRG at a hearing to discuss a draft of the PRA held before the House Committee on General and Military Affairs. In explaining his suggestion to add the proviso language, the VPIRG representative stated that:

> Section 317(5) is too broad. Records dealing with the detection and investigation of crime can include reports by a town board of selectmen on the conduct of its police chief, simple records of the number of arrests made in a year and other similar statistical information. I believe that the intent of this section is to exempt from public view only actual investigatory files. The intent would be better served if the following provision were added to the end of the subsection: "and provided that records relating to the management, direction, or efficiency of a police force shall be considered as public record."

The specific management and direction proviso language present in the current PRA was recommended by a member of the Committee on General and Military Affairs and was added to the House draft of the PRA by amendment on March 28, 1975, approximately one month after the VPIRG representative made his proviso suggestion.

¶ 47. According to the affidavit of the assistant attorney general, the records at issue in this case include "an application for an inquest," "other documents relating to the inquest," and "materials obtained pursuant to the inquest." The superior court denied access to these materials pursuant to 1 V.S.A. § 317(c)(1), the disclosure exemption that applies to "records which by law are designated confidential." It ruled that the records are by law designated confidential by virtue of 13 V.S.A. § 5134, which provides:

> [A] stenographer shall be sworn to keep secret all matters and things coming before the judge at such inquest. Such oath shall be in writing, and the stenographer shall not disclose testimony so taken by him or her except to the attorney general, state's attorney and the judge holding the inquest. The minutes of the testimony so taken shall be the property of the state and the same or copy thereof shall not go out of the possession of such attorney general, state's attorney or their successors except to an attorney appointed by the supreme court or superior court to act in the place of or assist a state's attorney.

The stenographer described in the section is hired to "take and transcribe the testimony of the witnesses for the use of the state's attorney." *Id.* § 5133.

¶ 48. The majority opinion summarily dismisses the arguments concerning the inquest materials without describing what happened in this case or providing the information necessary for decision on the merits. In my opinion, three points are critical to the decision. Because the majority has chosen to reject the Herald's arguments based on a lack of preservation, I start with a discussion of the procedural context for our discussion.

¶ 49. As stated by the majority, a reporter from the Herald sought records related to the death and possible criminal activity of David McMullen from the VSP and Attorney General's office. Those agencies denied the request without disclosing that some of the records were inquest records. They disclosed the existence of the inquest records for the first time in their response to the Herald's motion for summary judgment. The Herald immediately responded that the inquest materials were subject to different regulations. The Herald noted that the inquest materials were

court records subject to 4 V.S.A. § 693,[10] the disclosure of which could not be controlled by the Attorney General. It noted that "the Attorney General has failed to provide even basic information to examine the docket for this inquest, including the name of the case, the location of the court and the docket number." It concluded with a request that the superior court release the inquest records: "Thus, the Court should release the inquest materials because the statute, case law, history of the inquest, and facts all warrant disclosure in this case." The defendants responded that inquest records are confidential by statute, 13 V.S.A. § 5134, and that, in any event, the criminal investigation exemption under the PRA, 1 V.S.A. § 317(c)(5), controls inquest records.

¶ 50. The superior court ruled that the inquest records are confidential under 13 V.S.A. § 5134, a ruling I believe is wrong as I discuss *infra*. The Herald then moved in this Court for us to order disclosure of the records. Defendants opposed the motion, in part, on the grounds that the Herald asked the trial court to disclose the records and is appealing the refusal of the court to do so. A Justice of this Court deferred the motion to the merits. The majority has denied this motion without any explanation.

¶ 51. In making its arguments to the superior court and this Court, the Herald has relied primarily on two decisions of this Court. The first is *In re D.L.*, 164 Vt. 223, 230, 669 A.2d 1172, 1177 (1995), which holds that the inquest is an exercise of judicial power and, thus, necessarily that inquest records are judicial records. The second is *In re Sealed Documents*, 172 Vt. 152, 156, 772 A.2d 518, 522-23 (2001), which held that search warrant records are publicly accessible court records, subject to closure in specific instances, even though they are records that deal with the detection and investigation of crime. I agree that these cases control the decision before us and require that we hold that the inquest records are accessible. There is nothing novel in either the Herald's argument or the proper analysis of it.

¶ 52. The second point involves the true nature of the vast majority of modern inquests. In denying access to the inquest

---

[10] The Legislature repealed 4 V.S.A. § 693 on July 1, 2010, because it was unnecessary due to the reorganization of the judicial system to eliminate district courts. See 2009, No. 154 (Adj. Sess.), § 238(a)(1). The largely similar, presently applicable language for courts lies in 4 V.S.A. § 652(4). In *State v. Tallman*, 148 Vt. 465, 472, 537 A.2d 422, 426 (1987), we construed § 652(4) and § 693 to have the same meaning.

records, the superior court relied upon the statute that makes confidential the record of the testimonial inquest proceeding taken by a stenographer. In fact, the testimonial inquest procedure is, for the most part, a rarely used historical artifact, left over from the days when the prosecutor did not have the evidence-gathering tools that exist today. There have been few, if any, inquest proceedings in which testimony was taken in years. Instead, the inquest has been turned into a proceeding in which the court issues investigatory subpoenas for documents or evidence sought by law enforcement officers, with no in-court proceeding and no testimony. The documents or evidence are then provided directly to the law enforcement officers who use them in their investigation. The actual process is described in our recent decisions in *State v. Simmons*, 2011 VT 69, ¶¶ 3-4, 190 Vt. 141, 27 A.3d 1065, and *In re Inquest Subpoena (WCAX)*, 2005 VT 103, ¶¶ 2-4, 179 Vt. 12, 890 A.2d 1240. It is telling that proceedings and documents in the latter case were entirely publicly accessible — directly contrary to the superior court decision in this case.

¶ 53. More importantly, the testimonial inquest procedure does not describe this case. The inquest process in this case consists in its entirety of four documents. First, a prosecutor and police officer applied for an inquest on a standard form, District Court Form 454, printed by the Judiciary and made available to law enforcement officers. The form provides both the request for the inquest and the court's approval. Second, the police officer attached an affidavit to the request, specifying the grounds for the request. Third, the prosecutor and law enforcement officers filed a subpoena for the judge to sign, and the judge signed it. In a case like this one, the subpoena specifies the holder of the records and the records and information subject to the subpoena and provides a date by which the records and information are to be brought to court. It states, however, that the recipient of the subpoena can comply by sending the information to a specified law enforcement officer or prosecutor. The order for an inquest specifies no date for a hearing and does not appoint a stenographer. The order and subpoena are faxed to the keeper of the records. Finally, the entity subject to the subpoena complied by fax. The response did not go to the court.

¶ 54. It is obvious that the investigatory subpoena is being used in cases where the record keeper will not release the record or information without a court order. Once the court order is

forthcoming, there is no need for the record keeper to deal with the court, especially given the invitation to provide the record or information directly to the law enforcement officer or prosecutor. That occurred in this case.

¶ 55. The essence of an inquest is described in 13 V.S.A. § 5132: "A judge may issue necessary process to bring witnesses before him or her to give evidence in any matter there under investigation. The witnesses shall be sworn . . . ." In the current use of the inquest statute, there will be no witnesses and no witnesses will be sworn. There will be no "testimony of the witnesses" and no stenographer. See *id.* § 5133.[11] The State is taking the title of the procedure — "inquest" — and using it for a different purpose and procedure.

¶ 56. In many ways, the inquest procedure, as it is currently used, is most akin to a search warrant because it is authorizing the gathering of evidence involuntarily from a person, including a corporation or other legal entity. We noted this identity of purpose in *In re Inquest Subpoena (WCAX)*, 2005 VT 103, ¶ 11 n.1. There is no policy reason to distinguish a search warrant and the records used to obtain the warrant from an inquest investigatory subpoena and the records used to obtain the subpoena.

¶ 57. My third preliminary point is that the inquest is "viewed as the exercise of judicial power." *In re D.L.*, 164 Vt. at 230, 669 A.2d at 1177. Again, we likened the judicial role in an inquest to the issuance of a search warrant, *id.* at 231, 669 A.2d at 1178, and concluded "that the [inquest] statute 'authorizes the courts to perform a function so closely connected with and so far incidental to strictly judicial proceedings that the courts in obeying the

---

[11] I have serious questions about the validity of the current practice as an inquest. The Legislature has given prosecutors investigatory subpoena power in specific types of cases, see 9 V.S.A. § 2460 (consumer fraud), specifically describing the procedure. The Legislature would know how to create such a procedure here. Nothing in the language of the inquest statutes indicates that the Legislature intended this use of the inquest procedure. We have held that "the statutory authority under which inquests are conducted is to be strictly construed, and will not be regarded as including use for any purpose not clearly and intelligibly described in the statutory language so as to be manifestly within the legislative intent." *In re Certain Inquest Minutes*, 137 Vt. 595, 596, 409 A.2d 593, 593 (1979) (per curiam); see also *State v. Alexander*, 130 Vt. 54, 60, 286 A.2d 262, 265 (1971) ("[S]tatutes will not be regarded as including anything not clearly and intelligibly described in the words thereof . . . ."). It is hard to see how the current practice meets this standard. I need not come to a definitive position on this issue because this case involves access to the inquest records, and not the validity of the inquest.

statute would not be exercising executive or nonjudicial powers,' " *id.* at 233, 669 A.2d at 1179 (quoting *Lachapelle v. United Shoe Mach. Corp.*, 61 N.E.2d 8, 10 (Mass. 1945)). Thus, despite the investigatory purpose, an inquest is a judicial proceeding and inquest records are court records.

¶ 58. Like the issuance of a search warrant, the issuance of an investigatory subpoena is both a power critical to law enforcement and an intrusion into the basic rights of citizens. It is one of the greatest powers of the judiciary and, because of the invasion of citizens' privacy interests, a power that must be carefully regulated to ensure it is not misused. There are reasons particularly for oversight of the subpoena power. Unlike the search warrant power, the constitutional limitations on the subpoena power are very limited and more unclear. See generally 2 W. LaFave, Search & Seizure § 4.13(a) (4th ed. 2004). We held in *D.L.* that a judge can refuse to grant a request for an inquest, which necessarily includes the power to refuse to grant a request for a subpoena, but we did not establish standards for exercise of that discretion. 164 Vt. at 234, 669 A.2d at 1179-80. Thus, subject to very limited constitutional restrictions, a judge may decide to grant a subpoena request, or not, with no specification of reasons and with limited — or no — specification of grounds.

¶ 59. Three out of four of the records withheld in this case are judicial branch records because they are in the control of the judiciary and involve a judicial action and the basis for that action. This is the holding of *State v. Tallman*, 148 Vt. at 472-73, 537 A.2d at 426-27, a case in which the State also argued that the exemption of 1 V.S.A. § 317(c)(5) followed criminal investigation records into the court. We held in *Tallman* that affidavits of probable cause were executive branch records controlled by § 317(c)(5) "[p]rior to inspection by a court." *Id.* at 472, 537 A.2d at 426. After review by a court, access was controlled by Title 4, which made them publicly accessible.[12] *Tallman* was followed with respect to search warrant records in *In re Sealed Documents*, 172 Vt. at 158-59, 772 A.2d at 524-25. The rule of *Tallman* and *In re Sealed Documents* is now codified in PACR 3(j).[13]

---

[12] *Tallman* concerned the now-repealed § 693, see *supra*, n.10, but its holding is, by its own terms, just as applicable to the presently governing § 652(4).

[13] It is apparently significant to the majority that the Herald never cited PACR. I fail to see the significance of this omission. As the text says, the applicable rule

¶ 60. The three judicial records are the application for the inquest, the affidavit, and the subpoena. The defendants in this case have the identical records, either copies of the originals or the originals. The fourth record containing the information specified in the subpoena is not a judicial branch record because it never has been in the possession of the judiciary and was not the basis for judicial action. I agree that this record is governed by the PRA and is not subject to public access under 1 V.S.A. § 317(c)(5).

¶ 61. With the above three points in mind, I think it clear that there is no statutory bar to public access to the inquest records at issue in this case. While the statute read broadly provides that the inquest testimonial[14] hearing is secret, and public access is prohibited, nothing in its language suggests that documents created in connection with a so-called "inquest" that never will produce a testimonial hearing are covered by the statute. In this modern inquest, there is no evidentiary hearing and no stenographer. Our case law has interpreted the statutes to make the evidentiary hearing secret, see *Alexander*, 130 Vt. at 60, 286 A.2d at 265, but we have never held secret anything beyond the evidentiary hearing and its content. It is an unjustified expansion of the statute to hold that its coverage is greater; nothing in the statute supports that expansion.

¶ 62. There is one other ground for the majority opinion, and it requires special examination because I believe that it is directly contrary to how we should treat access-to-public-records appeals. The majority has apparently ruled that the Herald loses, in part, because it failed to request the inquest records from a superior court clerk. The public records request in this case was made in July 2010, nearly two years ago. Defendants did not disclose in

---

simply adopted without change the holding of *Tallman* and *In re Sealed Documents*. See Reporter's Notes to PACR 4 (citing *State v. Tallman*); Reporter's Notes to 2001 Amendment to PACR 6 (indicating that the 2001 amendment is to implement *In re Sealed Documents*).

[14] I am using the term testimonial here to mean the hearing in which testimony about a possible crime is taken, alone or in connection with other evidence. As *In re Inquest Subpoena (WCAX)*, 2005 VT 103, demonstrates, another kind of hearing is possible, one in which the entity subject to the subpoena contests the subpoena. It is unclear whether the statutes regulate public access to the record of that kind of proceeding, and we do not have to reach that point because there was no subpoena contest in this case. I find it significant, however, that the hearing and record in *In re Inquest Subpoena (WCAX)* were entirely open to the public.

their response to the request that part of the records being sought were inquest records. They disclosed the full nature of the records only in the litigation in the trial court in response to the Herald's motion for summary judgment. The Herald immediately responded with a request that the superior judge, before whom the Herald was appearing, release the judicial records, noting that it did not know where and when the inquest occurred because the defendants did not disclose that information. The Herald has renewed that motion here.

¶ 63. The law specifies no venue for inquest proceedings. The inquest here was requested by an assistant attorney general based on the affidavit of a state police officer. The request could have been made to any superior court, including in Washington County. As it happened, the inquest request was made in Rutland County, but the Herald had no way to determine this. Indeed, it appears that the Herald is learning this for the first time by reading this dissent. Like search warrants, there is no way to determine where inquest records exist, if at all. The inability to locate search warrant records has been a subject of recent controversy, with a bill to require a searchable database currently pending in the Vermont Senate. See S.138, 2011-2012 Gen. Assem., Adj. Sess. (Vt. 2012). The exact same problem exists with respect to inquest records.

¶ 64. Whether we are acting under the PRA or PACR, government records are presumed accessible unless the custodian can show that they come within an exemption. It is the custodian's burden to identify the exemption, not the requester's burden. The processing of a public records request is to be "expedited in every way." 1 V.S.A. § 319(b); see also PACR 6(h) (directing that appeal of denial of access to court records be "decided as soon as possible").

¶ 65. In the face of the clear deviation from the intended expeditious process, the majority has introduced a new technicality to deny access to records — the record must be requested from a superior court clerk, apparently the clerk of the county where the record resides. By this decision, this Court is creating an elaborate hide-and-seek game that relies upon artificial barriers to deny access without ever reaching the merits. Thus, after eighteen months of trying, the Herald is told that its request for the inquest records will not be honored because it failed to meet a procedural requirement raised for the first time by this Court

and with which it could not comply because it was denied the information to do so.

¶ 66. The issue of access to the inquest records is wholly one of law that has been decided by the superior court in this case and has been briefed and argued in this Court. The majority's objection is a pure technicality; nothing would be gained by a decision of the clerk for Rutland Unit or of the superior judge sitting in Rutland County. None of the parties raised the objection of the majority. If anything, it is a matter of venue that can be, and was, waived. By separate motion, the Herald has asked that we order the release of the inquest records. We should grant that motion or, in any case, decide it on the merits and not a technicality.

¶ 67. There is another reason why it is inappropriate for this Court to dismiss the inquest record issue without resolving it. As the majority states, this case started as a request to defendants to view certain public records they possess. Those records include the three inquest-related records at issue. Defendants have either copies or originals of those records. Nothing in the PRA or PACR distinguishes between originals and copies. Nor is the status of the holder of the record determinative of the right to access the record under either of these governing legal regimes. Thus, the law governing access is the same whether the Herald requests the records from a superior court clerk or the Attorney General or the Vermont State Police. These are judicial branch records governed by 4 V.S.A. § 652(4) and PACR. Thus, the Herald can request these records from defendants and has the same right of public access as if the request were made to the superior court.

¶ 68. The idea that the accessibility of a record depends on from whom it is requested is at odds with both common sense and the PRA, which explicitly countenances "consultation" between agencies in responding to public records requests. See 1 V.S.A. § 318(a)(5)(C). The existence of this provision in the PRA implies a legislative intent that agencies not summarily deny requests for documents in their possession on the grounds that they originated in another agency. Considering an analogous consultation provision in the federal Freedom of Information Act (FOIA), 5 U.S.C. § 552, federal courts have held that refusing a request and instead referring the applicant to the original source of the documents constitutes improper withholding of documents. See *McGehee v. CIA*, 697 F.2d 1095, 1110 (D.C. Cir. 1983) ("[An agency] cannot

simply refuse to act on the ground that the documents originated elsewhere."); *Founding Church of Scientology of Washington, D.C., Inc. v. Bell*, 603 F.2d 945, 953 n.54 (D.C. Cir. 1979) ("Under FOIA an agency may take ten extra days in responding to a document request when it must consult with an originating agency on whether a requested document should be released. But the agency that received the initial FOIA request retains responsibility for producing the document." (citation omitted)); *Davis v. FBI*, 770 F. Supp. 2d 93, 104 n.8 (D.D.C. 2011) ("Even if such records may be found in a court or another agency, the agency receiving a FOIA request is obligated to produce any responsive records that are in its custody and control at the time of the request."). In this case, there was not even a referral; the request was flatly denied.

¶ 69. We should hold that the Herald preserved its position that the judiciary release the inquest records and defendants waived any objection based on the location of the court to which the request was made. Alternatively, we should hold that the Herald has the same right of public access from defendants as from the judiciary. Once we reach the merits, we should release the three inquest records that are judicial records.

¶ 70. I respectfully dissent from the majority decision with respect to the inquest records.